Kenny Lynn VAUGHT, Appellant,

v.

VAUGHTS, INC./SOUTHERN MISSOURI CONSTRUCTION and Commercial Union Insurance Company, Respondents,

and

Treasurer of Missouri as Custodian of the Second Injury Fund, Appellant.

Nos. 20899, 20935.

Missouri Court of Appeals, Southern District, Division Two.

Feb. 6, 1997.

Steven Harrell, Strong & Associates, P.C., Springfield, for appellant Vaught.

Jeremiah (Jay) Nixon, Atty. Gen., Jefferson City, Carol T. Aiken, Asst. Atty. Gen., Springfield, for appellant Treasurer of Mo.

Raymond E. Whiteaker, John Wise, Whiteaker & Wilson, P. C., Springfield, for respondents.

CROW, Presiding Judge.

Kenny Lynn Vaught ("Claimant") was injured September 16, 1990, in an accident arising out of and in the course of his employment. He sought compensation under The Workers' Compensation Law[1] from his employer and the Treasurer of Missouri ("Treasurer") as custodian of the Second Injury Fund.

As to the Second Injury Fund, Claimant alleged he sustained a previous injury February 12, 1988, resulting in disability of "55% of the body as a whole." Therefore, pled Claimant: "Once [the] amount of disability [is] determined, [the] balance claimed will be [the] difference between [the] combined disabilities and 100%."

1. Chapter 287, RSMo 1994, as amended.

An administrative law judge ("ALJ") of the Division of Workers' Compensation found Claimant "would be permanently and totally disabled as a result of the September 16, 1990, injury alone." Consequently, the ALJ awarded Claimant compensation for permanent total disability against the employer and its insurer ("Respondents"). The ALJ calculated the weekly rate at $266.67 and ordered it paid to Claimant "so long as [he] remains permanently and totally disabled." The ALJ also awarded Claimant $43,881.85 for past nursing services provided by his wife.

As to the Second Injury Fund, the ALJ held:

"Since the September 16, 1990, injury alone results in permanent total disability, no combination of disabilities need be considered. Thus the Second Injury Fund has no liability to [Claimant] in this case."

On application for review by Respondents, the Labor and Industrial Relations Commission ("Commission") issued a "Final Award Allowing Compensation." Commission, like the ALJ, found Claimant permanently and totally disabled. However, Commission found that Claimant, prior to the accident of September 16, 1990, had permanent partial disability of "50 percent of the body as a whole." Consequently, Commission held Respondents were liable for only permanent partial disability; Commission imposed liability on the Second Injury Fund for permanent total disability. Commission calculated the respective liabilities thus:

"Using the average weekly wage rate [of $400] calculated by the [ALJ] which has not been challenged by the parties, the permanent partial disability rate is the maximum $198.75.

*For Permanent Partial Disability—Employer/Insurer*

The sum of $198.75 per week for 200 weeks, beginning September 16, 1990, for a total of $39,750.00

*For Permanent Total Disability—Second Injury Fund*

The sum of $67.92 ($266.67—198.75) for 200 weeks, beginning September 16, 1990, for a total of $13,584.00

Thereafter, the sum of $266.67 [per week] for the remainder of the claimant's life."

Commission also held Claimant was not entitled to compensation for past nursing services provided by his wife.

Claimant and Treasurer appeal from Commission's award. Claimant's appeal is number 20899; Treasurer's appeal is number 20935. We consolidated the appeals.

Claimant presents three points relied on; Treasurer presents one.

Treasurer's point avers Commission erred in awarding permanent and total disability benefits against the Second Injury Fund in that the overwhelming weight of the evidence established that Claimant was permanently and totally disabled by the September 16, 1990, accident alone, hence only Respondents are liable for Claimant's permanent and total disability.

Treasurer's claim of error is almost identical to a segment of Claimant's third point which reads:

"The ... Commission's award limiting [Respondents'] liability to permanent partial disability of 50 percent of the body as a whole and awarding liability against [Respondents] for only 200 weeks is not supported by sufficient, competent evidence because:

A. The overwhelming weight of the evidence demonstrated [Claimant] would have been permanently and totally disabled due to injuries from the September 1990 accident alone and of itself and without regard to his pre-existing condition in that the evidence showed: [here, the point itemizes seven respects in which the evidence, according to Claimant, supports his position]."

Because the above claims of error hinge on weight of the evidence, we must endeavor to condense—without sacrificing accuracy—the massive evidence regarding Claimant's impairment.

April 20, 1987. Claimant is injured in an accident ("Accident 1"). Records of the Division of Workers' Compensation ("Division") show he settled a workers' compensation claim against his employer arising from Acci-

dent 1 based on "[a]pproximately 5 percent permanent partial disability to the body as a whole."

February 12, 1988. Claimant is injured in an accident ("Accident 2"). Records of the Division show he settled a workers' compensation claim against his employer arising from Accident 2 based on "[a]pproximately 55 percent permanent partial disability to the body as a whole."

March 9, 1990. Claimant is injured in an automobile accident ("Accident 3").

September 16, 1990. Claimant is injured in the accident in dispute in these appeals ("Accident 4").

Evidence presented to the ALJ included live testimony, depositions, and documents.

In a meticulous analysis of the evidence, the ALJ reviewed testimony by Claimant, Claimant's brother, Claimant's wife, and a man who worked alongside Claimant before Accident 4. The essence of that testimony was that despite Accidents 1, 2 and 3, Claimant was able to operate heavy equipment, take care of livestock, and conduct mule rodeos prior to Accident 4.

However, the testimony also showed that one of the injuries Claimant suffered in Accident 2 was to his head, which caused headaches and "short-term memory loss." Additionally, "he became tired more easily." The testimony further indicated that these ailments gradually diminished during the ensuing two years, but were aggravated by Accident 3. In Claimant's words: "[A]fter [Accident 3], one of the doctors ... told me ... it rescrambled my ... brain and set me back a little."

Opinion evidence about Claimant's impairment came from the following sources.

Wilbur Swearingin. Rehabilitation counselor. Testified at ALJ hearing (March 2–4, 1994).

Terry Winkler. Medical doctor. Testified at ALJ hearing; wrote report November 15, 1993.

William P. Folck. Medical doctor. Wrote report March 10, 1992.

Bernard M. Abrams. Medical doctor. Wrote report May 4, 1993.

Michael Whetstone. Psychologist. Wrote report August 15, 1990 (before Accident 4).[2]

Courtney Whitlock. Medical doctor. Deposition January 19, 1994.

Rodney D. Quinn. Medical doctor. Deposition December 9, 1993; wrote report December 31, 1992.

The ALJ noted that Winkler's last examination of Claimant was February 11, 1994, three weeks before the hearing. Winkler, a physiatrist,[3] avowed Claimant was permanently and totally disabled as a result of Accident 4 alone.

The ALJ summarized Whitlock's deposition, noting that Whitlock, a neurological surgeon specializing in spinal surgery, treated Claimant after Accident 1. Whitlock found Claimant had a lower lumbar strain and released him to return to work the following month. Whitlock's records reflect no assessment of permanent disability regarding Accident 1. Whitlock did not see Claimant again until January 21, 1993. A few days later, Whitlock performed spinal surgery on Claimant, necessitated by an injury Claimant suffered in Accident 4. On March 17, 1993, Whitlock concluded Claimant had "15 percent permanent partial disability" due to Accident 4.

Evaluating Folck's report, the ALJ observed that Folck, an "occupational medicine" specialist, found Claimant had "permanent partial disability of the body as a whole of 55%" prior to Accident 4. After Accident 4, Folck concluded Claimant had: (1) disability of the right leg between ankle and knee of 75 percent, equating to 30 percent permanent partial disability of the body as a whole, (2) disability of the left foot in the metatarsus of 25 percent, equating to 7 percent permanent partial disability of the body as a whole, (3) disability of the right wrist and forearm of 30 percent, equating to 15 percent permanent partial disability of the body as whole, and

(4) aggravation of the head injury from Accident 2 resulting in an additional disability of 10 percent of the body as a whole. Folck therefore concluded Claimant sustained permanent partial disability of 62 percent of the body as a whole—the sum of items 1 through 4 in the preceding sentence—as a result of Accident 4. That impairment, combined with Claimant's preexisting disability, led Folck to conclude that Claimant is "totally disabled for useful work activities."

The ALJ next considered Abrams's report. Abrams, a neurologist, believed a 55 percent permanent partial disability rating from Accident 2 was reasonable. As to Accident 4, Abrams: (1) assigned a rating of 10 percent permanent partial disability of the body as a whole because of "worsening of [Claimant's] mental condition because of the obvious depression induced by multiple injuries," (2) agreed with Folck that the impairment of Claimant's right foot amounted to 30 percent permanent partial disability of the body as a whole, (3) added 10 percent permanent partial disability of the body as a whole because of "reflex sympathetic dystrophy of the right foot, not previously rated by Dr. Folck," (4) assigned a rating of 25 percent permanent partial disability of the body as a whole because of the spinal condition for which Whitlock performed surgery in January, 1993, (5) rated the impairment of Claimant's left foot at 7 percent permanent partial disability of the body as a whole, and (6) like Folck, rated the impairment of Claimant's right forearm at 15 percent permanent partial disability of the body as a whole. Abrams thus concluded that Accident 4 caused Claimant permanent partial disability of 97 percent of the body as a whole, "which in combination with [Accident 2] obviously leads to an impairment of more than 100% since he was 55% impaired."

The ALJ then turned to Quinn's deposition and report. Quinn, a neurologist, treated Claimant after Accidents 2, 3 and 4. Quinn concluded that because of Claimant's "defi-

2. Rehabilitation counselor Swearingin testified he relied on information in Whetstone's report. The ALJ received Whetstone's report for the limited purpose of showing the information on which Swearingin relied.

3. Winkler explained that a physiatrist is a specialist in "rehabilitation medicine and physical medicine." Rehabilitation medicine deals with "chronic disabling conditions."

cits in intelligence, thinking, perception, judgement, affect, behavior and daily living, there is a 75% impairment of the body as a whole." Additionally, Quinn concluded that the "spinal nerve root dysfunction and recent spinal findings" (evidently the condition for which Whitlock performed the January, 1993, surgery) accounted for an additional 8 percent permanent partial disability of the body as a whole. Consequently, Quinn concluded Claimant's "combined impairment of the whole person is 83%." According to Quinn, Accident 2 accounted for 70 percent of that impairment, Accident 3 accounted for 5 percent, and Accident 4 accounted for 8 percent. In his deposition, Quinn said Claimant's "cognitive injury" accounted for more of his impairment than the "physical orthopedic injury." Quinn added: "I would have to say that possibly 65 percent of his impairment was related to the cognitive aspect and 35 percent to the physical aspect." Quinn's testimony continued:

"Q. ... the cognitive aspect which you attribute 65 percent of the disability to relate to [Accident 2] and [Accident 3], would that be correct?

A. That is correct.

Q. And then the orthopedic injuries to which you attribute 35 percent of the disability to would relate to [Accident 4], would that be correct?

A. That is correct."

Finally, the ALJ reviewed Swearingin's testimony. Swearingin avowed that as a result of the "disabilities" Claimant suffered from Accident 4, he is not "employable in the competitive labor market" and is consequently permanently and totally disabled due to Accident 4. Swearingin was aware of the "head injury" Claimant sustained in Accident 2 and the aggravation of that injury in Accident 3. Nonetheless, said Swearingin, "It's my ... opinion that his disability resulting from the traumatic injuries ... [in Accident 4] would be totally disabling irregardless [sic] of whether he'd ever suffered a head injury or not." Swearingin found no basis for an "industrial disability" in regard to Accident 1.

Explaining why he concluded that Claimant was permanently and totally disabled as a result of Accident 4 alone, the ALJ pointed out that such a finding was supported by the testimony of both Winkler and Swearingin. Furthermore, noted the ALJ, Folck found Claimant permanently and totally disabled and attributed 62 percent of the disability to Accident 4, and Abrams found Claimant 97 percent permanently and totally disabled because of Accident 4 alone.

The ALJ declared Quinn's testimony "less credible" because his findings were directed toward his speciality, cognitive problems relating to Claimant's neurological difficulties, and pertained primarily to Accident 2, the origin of those problems.

As additional support for his finding, the ALJ relied on the lay testimony identifying the work Claimant was able do until Accident 4.

Commission, like the ALJ, assiduously evaluated the evidence, paying particular attention to a portion of Quinn's report which stated that on July 17, 1990 (after Accident 3 but before Accident 4), Claimant's wife telephoned that "[Claimant] could no longer work because of his various impairments and that they were applying for Social Security disability." Quinn recommended a neuropsychology evaluation to support the claim.

Apparently in response to Quinn's suggestion, Whetstone evaluated Claimant in August, 1990, and recorded his findings in his report (mentioned earlier). Commission noted that Whetstone's report contains a conclusion that prior to Accident 4, Claimant's "overall vocational capacity has been significantly affected by his acquired memory impairment." Commission further noted a statement in Whetstone's report that Claimant's "ability to engage in his previous level of vocational functioning is dramatically impaired."

Commission pointed out that Abrams's report acknowledged the 55 percent permanent partial disability from Accident 2 and said Claimant's impairment from Accident 4 was "less than 100 percent."[4] Commission then

---

4. As we have seen, Abrams concluded Accident 4 caused Claimant permanent partial disability of 97 percent of the body as a whole.

took note of Whitlock's opinion that Claimant's back injury in Accident 4 resulted in 15 percent permanent partial disability, and Whitlock's conclusion that "some of [Claimant's] problems preexisted [Accident 4]." [5]

Next, Commission emphasized that Folck found Claimant had permanent partial disability of 55 percent of the body as a whole prior to Accident 4, and that Folck concluded Claimant sustained 62 percent permanent partial disability of the body as a whole as a direct result of Accident 4.

Commission disagreed with the ALJ's credibility assessment that Winkler was more believable than Quinn. Citing *Davis v. Research Medical Center,* 903 S.W.2d 557 (Mo.App. W.D.1995), Commission stated that as an aid in appellate review, it would set forth its reasons for departure from the ALJ's findings.

Commission then pointed out that during cross-examination, Winkler admitted that in his report he assigned 40 to 50 percent of Claimant's impairment to Accident 2 and the remainder to Accident 4. Commission also asserted that Winkler testified on direct examination that Claimant's permanent and total disability was attributable solely to the injuries Claimant sustained in Accident 4, but on cross-examination Winkler conceded that Claimant's "head injury" in Accident 2 resulted in permanent disability prior to Accident 4. Furthermore, Winkler agreed with Quinn's assessment that Claimant had 75 percent permanent partial disability to the body as a whole as a result of the brain injury in Accident 2. Commission concluded: "Due to the inconsistencies, Dr. Winkler's opinion should be controlling." [6]

Assessing Swearingin's testimony, Commission said: "Swearingin's opinion that the claimant was permanently and totally dis-

abled from [Accident 4] alone is premised on his belief that the claimant suffered from no preexisting physical impairments and only a 'mild' cognitive impairment." Commission referred to a segment of Swearingin's testimony where he avowed (1) he was unable to identify any "physical restrictions or impairments of a vocational nature prior to [Accident 4]," and (2) Claimant sustained only a "mild head injury" in Accident 2 resulting in "mild impairment."

Commission held Swearingin's "presumption" was "not supported by the medical opinions of the various doctors who testified in this case." Commission added: "All physicians indicated that [Claimant] suffered significant preexisting disabilities or impairments. Because Mr. Swearingin based his finding on an incorrect premise, it has less weight."

Commission ended its evaluation of the evidence thus:

"Dr. Abrams, Dr. Folck, and Dr. Quinn all state at some point in their testimonies or records that the claimant's current degree of impairment or disability is the result of a combination of preexisting injuries and the injury from the last accident. With that medical evidence, together with the testimony of the claimant and his wife, the evidence supports the finding that the claimant's permanent total disability is from a combination of injuries sustained on at least two different occasions and not from the September 1990 injury, alone. Based on the evidence summarized above, the claimant's preexisting permanent partial disability is assessed at 50 percent of the body as a whole."

Commission then ostensibly applied § 287.220.1, RSMo Cum.Supp.1993, to those findings and calculated the respective liabili-

---

**5.** We gather that Commission was referring to an answer Whitlock gave when asked whether there was any "relationship" between Accident 1 and the condition for which Whitlock performed surgery on Claimant in 1993. Whitlock said: "In treating the problems of the back related to degenerative arthritis, which [Claimant] certainly had, any injury in one of many is an additive factor. Cumulative injuries will cause the final problem. So I would say, although there is a long distance temporally between the two inju-

ries, that probably since he did have to stay off work for some time, probably this did add to the eventual changes of degenerative arthritis in some way."

**6.** We infer Commission inadvertently omitted the word "not" from that sentence, and that Commission intended to say: "Due to the inconsistencies, Dr. Winkler's opinion should not be controlling."

2### 22222222222

222222

2222222222

ties of Respondents and the Second Injury Fund as set forth *supra* at the end of the fifth paragraph of this opinion.

The briefs of all parties demonstrate they agree with Commission's finding that Claimant is permanently and totally disabled. However, Claimant and Treasurer maintain that Respondents alone are liable for all compensation to which Claimant is entitled because Accident 4 was sufficient, by itself, to render Claimant permanently and totally disabled. Respondents argue otherwise, insisting that Commission's finding that Claimant is permanently and totally disabled as a result of the combination of impairments attributable to Accidents 1 through 4 is "supported by substantial competent evidence and [is] not contrary to the overwhelming weight of the evidence."

The version of § 287.220.1 in RSMo Cum. Supp.1993, which Commission endeavored to apply in making its award, was carried forward unchanged in RSMo 1994 and remains intact. As we comprehend the parties' briefs, they agree that the provisions of § 287.220.1 which we must apply in determining whether Commission erred in imposing liability on the Second Injury Fund are those in the version identified in the preceding sentence. As that is how the parties frame the issue, we shall assume, without deciding, that they are correct.[7]

Section 287.220.1, RSMo Cum.Supp.1993, reads, in pertinent part:

"All cases of permanent disability where there has been previous disability shall be compensated as herein provided. Compensation shall be computed on the basis of the average earnings at the time of the last injury.... If the previous disability or disabilities, whether from compensable injury or otherwise, and the last injury together result in *total and permanent disability,* ... the employer at the time of the last injury shall be liable *only* for the *disability resulting from the last injury*

considered *alone and of itself;* except that if the compensation for which the employer at the time of the last injury is liable is *less* than the compensation provided in this chapter for *permanent total disability,* then in *addition* to the compensation for which the employer is liable and *after the completion of payment of the compensation by the employer,* the employee shall be paid the *remainder* of the compensation that would be due for *permanent total disability* under section 287.200 out of a special fund known as the 'Second Injury Fund'...." (Emphasis added.)

In *Stewart v. Johnson,* 398 S.W.2d 850 (Mo.1966), a workers' compensation case, Commission found that an employee sustained a compensable injury in an accident in 1959 which, considered alone and of itself, was equal to 50 percent permanent disability of the body as a whole. *Id.* at 852. Commission further found that prior to the 1959 accident, the employee had permanent disability equal to 50 percent of the body as whole, and that the prior disability plus the 1959 injury resulted in total and permanent disability. *Id.* The issue before the Supreme Court was whether Commission correctly calculated the respective liabilities of the employer and the Second Injury Fund. *Id.*

The Supreme Court resolved the issue by applying the version of § 287.220.1 in RSMo 1959. *Id.* at 851 n. 1 and 852–53. Its relevant provisions are set forth in the Supreme Court's opinion. *Id.* at 853. In all respects pertinent to the instant case, the 1959 version is identical to the 1993 version, quoted *supra.* Explaining the purpose of § 287.220.1, the Supreme Court said:

"To accomplish the object of encouraging industry to employ the partially handicapped it was necessary that the legislature (1) partially, at least, relieve the employer of his liability to an em-

---

7. The version of § 287.220.1 in RSMo Supp.1987 was in effect when Accident 4 occurred. That version differs from the version in RSMo Cum. Supp.1993. *Leutzinger v. Treasurer of Missouri,* 895 S.W.2d 591 (Mo.App. E.D.1995), holds that one provision of the 1993 version of § 287.220.1 applies retroactively. *Smart v. Missouri State*

*Treasurer,* 916 S.W.2d 367 (Mo.App. S.D.1996), holds that another provision of the 1993 version of § 287.220.1 applies prospectively. Because the parties here agree that the pertinent provisions of the 1993 version apply, we are not confronted by the issues addressed in *Leutzinger* and *Smart.*

ployee for disability not specifically attributable to injury suffered while in his employment, and, (2) protect the employee by providing a fund from which he would be compensated for that portion, if any, of his disability above that attributable to his last injury. One section (§ 287.220) of the Workmen's Compensation Law expresses this purpose and adopts in broad outline the above scheme.... The extent of liability of the [Second Injury] fund being fixed by the legislature as the balance or remainder, if any, of the disability after determination of the extent of liability of the employer, it was necessary that it fix and limit the latter's liability. For total and permanent disability resulting from a previous disability and the last injury together, it fixed and limited the employer's liability to that portion of the disability 'resulting from *the last injury considered alone and of itself.'* ...

In determining the liability of the employer in this case, we should first consider only the disability resulting from the last injury; otherwise the words 'considered alone and of itself' are meaningless. Until that disability is determined, it is not known whether the second injury fund has any liability, for the statute contemplates that the employer's liability for compensation may be at least equal to that provided for permanent total disability in § 287.200; otherwise, it would be meaningless to provide that the fund pay 'the remainder' if compensation due from employer for the last injury 'is less than' that to be paid for permanent total disability. Here the disability resulting from the last injury alone was a permanent partial disability."

*Id.* at 853–54 (emphasis in original).

The Supreme Court calculated the amount to which the employee was entitled for the permanent partial disability caused by the 1959 accident plus a healing period. *Id.* at 854. The Supreme Court held the employer liable for that sum. *Id.* The Supreme Court then calculated the compensation to which the employee was entitled for permanent total disability, subtracted the amount owed the employee by the employer from that

compensation, and held the Second Injury Fund liable for the difference. *Id.*

In the instant case it appears from Commission's explanation for its award that Commission did not apply § 287.220.1 in compliance with *Stewart.* As reported earlier, Commission found Claimant had "preexisting permanent partial disability" of 50 percent of the body as a whole. Later, immediately before calculating the respective liabilities of Respondents and the Second Injury Fund, Commission declared: "In summary, the employer/insurer's liability for permanent disability is limited to 50 percent of the body as a whole for [Accident 4]."

The only inference we can draw is that Commission, having found (a) Claimant had 50 percent permanent partial disability of the body as a whole before Accident 4, and (b) Claimant was permanently and totally disabled after Accident 4, calculated Respondents' liability by subtracting Claimant's preexisting permanent partial disability—50 percent of the body as a whole —from 100 percent.

■■■ As explained in *Stewart, id.* at 854, § 287.220.1 contemplates that where a partially disabled employee is injured anew and sustains additional disability, the liability of the employer for the new injury "may be at least equal to that provided for permanent total disability." Consequently, teaches *Stewart,* where a partially disabled employee is injured anew and rendered permanently and totally disabled, the first step in ascertaining whether there is liability on the Second Injury Fund is to determine the amount of disability caused by the new accident alone. *Id.* The employer at the time of the new accident is liable for that disability (which may, by itself, be permanent and total). *Id.* If the compensation to which the employee is entitled for the new injury is *less* than the compensation for permanent and total disability, then in addition to the compensation from the employer for the new injury, the employee (after receiving the compensation owed by the employer) is entitled to receive from the Second Injury Fund the remainder of the compensation due for permanent and total disability. § 287.220.1.

Having described how Commission should have calculated the liability of Respondents and the liability (if any) of the Second Injury Fund in the instant case, we return to Treasurer's assignment of error and Claimant's third point. As noted earlier, they aver the overwhelming weight of the evidence established that Claimant was permanently and totally disabled by the injuries in Accident 4 alone. Treasurer and Claimant urge us to affirm Commission's finding that Claimant is permanently and totally disabled, but to (1) reverse the segment of Commission's award imposing liability on the Second Injury Fund, and (2) hold Respondents liable for all compensation to which Claimant is entitled.

An attentive reader will recognize that if we rule that way, Commission's failure to follow § 287.220.1 and *Stewart* in calculating the respective liabilities of Respondents and the Second Injury Fund is of no consequence, as Respondents will have to pay all compensation to which Claimant is entitled, and the Second Injury Fund will escape untouched. However, as henceforth explained, the standard of review we must apply bars us, in these appeals, from holding Respondents liable for all compensation to which Claimant is entitled. Nonetheless, as also explained, we are compelled by § 287.220.1 and *Stewart* to reverse the segment of Commission's award calculating the respective liabilities of Respondents and the Second Injury Fund and remand the case to Commission for reconsideration of that issue.

We begin our explanation by pointing out that in order for us to hold Respondents liable for all compensation to which Claimant is entitled, we would have to declare, as a manner of law, that the only finding Commission could have properly made from the evidence is that Accident 4, alone and of itself, rendered Claimant permanently and totally disabled.

With that in mind, we take careful note of the law governing our review. All parties agree it is set forth in *Davis*, 903 S.W.2d at 571.

The first task imposed on us by *Davis* is to examine the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to Commission's award, to determine whether the record contains sufficient competent and substantial evidence to support the award. *Id.*

■ Because Treasurer's assignment of error and Claimant's third point attack Commission's finding that Claimant's permanent and total disability was not attributable to Accident 4 alone, but was instead attributable to a combination of the injuries in Accident 4 and injuries sustained on earlier occasions, we must determine whether there is sufficient competent and substantial evidence to support that finding. Said another way, we must decide whether there is sufficient competent and substantial evidence to support a finding that Accident 4 was not the sole cause of Claimant's permanent and total disability.

Evidence supporting Commission's finding that Claimant's permanent and total disability was not caused by Accident 4 alone includes: (1) Whitlock's deposition that Claimant has "15 percent permanent partial disability" due to Accident 4, (2) Folck's report that Claimant sustained permanent partial disability of 62 percent of the body as a whole as a result of Accident 4, (3) Abrams's report that Accident 4 caused Claimant permanent partial disability of 97 percent of the body as a whole,[8] and (4) Quinn's deposition and report that Accident 4 accounted for only a small percentage of Claimant's "combined impairment" of 83 percent of the "whole person."

We hold the above evidence, viewed favorably to Commission's award, constitutes sufficient competent and substantial evidence to support Commission's finding that Claimant's permanent and total disability was not attributable to Accident 4 alone.

That holding brings us to the second task imposed by *Davis*. In performing it, we continue to view the evidence in the light

---

**8.** Claimant argues that Abrams's report supports a finding that Claimant was permanently and totally disabled as a result of Accident 4 alone in that Abrams concluded Accident 4 made Claimant "unemployable" without regard to Accident 2.

most favorable to Commission's award, but this time we must consider all evidence in the record, including that which is contrary to the award, take account of the overall effect of all the evidence, and determine whether the award is against the overwhelming weight of the evidence. *Id.* In doing so, we take into consideration the credibility determinations of Commission and, if those determinations as to witnesses *who gave live testimony before the ALJ* are different than those made by the ALJ, we also consider the ALJ's credibility findings as well as the reasons, if any were given, why Commission differed with the ALJ's findings. *Id.*

According to Treasurer and Claimant, evidence contrary to Commission's finding that Claimant's permanent and total disability was not attributable to Accident 4 alone includes: (1) Winkler's testimony at the ALJ's hearing that Claimant was permanently and totally disabled as a result of Accident 4 alone, (2) Swearingin's testimony at the ALJ's hearing that Claimant was permanently and totally disabled due to Accident 4 irrespective of whether he "ever suffered a head injury or not," (3) evidence that Claimant's injuries in Accident 4 included crushed feet, facial lacerations, loss of four teeth, spinal problems and incessant pain, (4) lay testimony at the ALJ's hearing regarding the activities, including work, in which Claimant participated before Accident 4 but not thereafter, (5) surgical procedures and other medical treatment Claimant underwent after Accident 4, (6) Claimant's physical and mental impairments at the time of the ALJ's hearing, and (7) Winkler's forecast of future medical care Claimant will require.

As to item 1 in the preceding paragraph—Winkler's live testimony—we noted earlier in this opinion that the ALJ found Winkler credible but Commission disagreed. We set forth the reasons given by Commission; we shall not repeat them.

Claimant argues that in discounting Winkler's testimony, Commission misapplied § 287.220.1 and misunderstood Winkler's testimony and report. Claimant insists there were no inconsistencies.

Claimant's argument is persuasive only if one embraces Claimant's understanding of Winkler's testimony and report. Having studied Winkler's testimony and report, we find they can be reasonably understood the way Commission understood them. We therefore accept Commission's reasons for disagreeing with the ALJ regarding Winkler's credibility.

As to item 2 above—Swearingin's live testimony—we noted earlier in this opinion that Commission found Swearingin less credible than did the ALJ. We set forth Commission's reasons for discounting Swearingin's credibility. While those reasons are not as convincing as Commission's reasons for discounting Winkler's credibility, neither are they meritless.

As to item 4 above, there was indeed live testimony that after Accident 4 Claimant could engage in very few, if any, activities in which he participated before Accident 4. However, Respondents presented live testimony by an investigator. He avowed that a week before the ALJ's hearing, he saw Claimant driving a pickup towing a horse trailer at a rodeo and also saw Claimant walking around the arena several hours without sitting. Such activities were among those engaged in by Claimant before Accident 4.

In determining whether Commission's finding that Claimant's permanent and total disability was not attributable to Accident 4 alone is against the overwhelming weight of the evidence, we note that although the phrase "overwhelming weight of the evidence" appears several times in *Davis,* it is not defined there or, so far as we can discover, in any other Missouri case. In *Fujita v. Jeffries,* 714 S.W.2d 202, 206[4] (Mo.App. E.D.1986), the court said: "Preponderance of the evidence is that which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows the fact to be proved to be more probable than not."

■ It seems obvious to us that the phrase "overwhelming weight of the evidence" connotes evidence that is more persuasive than that which is merely "of greater weight or more convincing than the evidence which is offered in opposition to it." Defin-

ing the extent to which "overwhelming weight of the evidence" exceeds "preponderance of the evidence" is a task we shall leave to others. For the purpose of this opinion, we proceed on the premise in the first sentence of this paragraph. The conclusion we reach in the next paragraph is based on that concept of "overwhelming weight of the evidence."

■ Confining our review within the limits imposed by *Davis*, and mindful of the admonition in *Davis* that weight of the evidence and credibility of witnesses are ultimately for Commission, 903 S.W.2d at 571, we hold Commission's finding that Claimant's permanent and total disability was not attributable to Accident 4 alone is not against the overwhelming weight of the evidence. *A fortiori*, we cannot hold that the only finding Commission could have properly made from the evidence is that Accident 4, alone and of itself, rendered Claimant permanently and totally disabled. That being so, we necessarily deny the request of Treasurer and Claimant that we hold Respondents liable for all compensation to which Claimant is entitled.

To prevent misunderstanding of our holding, we emphasize that in this opinion we adjudicate only the issues presented in these appeals. Those issues do not require us to decide whether there is sufficient competent and substantial evidence to support a finding that Claimant's permanent and total disability is attributable to Accident 4 alone. Commission made no such finding, so no such finding is before us for review. The only issue we have been required to decide—and the only one we have decided—is that Commission's finding that Claimant's permanent and total disability is not attributable to Accident 4 alone is supported by sufficient competent and substantial evidence and is not against the overwhelming weight of the evidence. That holding obviously constitutes a denial of Treasurer's assignment of error and the portion of Claimant's third point set forth earlier.

There is another portion of Claimant's third point we have not yet mentioned. That portion avers the record does not contain sufficient competent and substantial evidence to support Commission's ruling limiting Respondents' liability to "50 percent permanent partial disability of the body as a whole."

As briefly mentioned earlier, we are compelled (for reasons that follow) to reverse the segment of Commission's award calculating the respective liabilities of Respondents and the Second Injury Fund and remand the case to Commission for reconsideration of that issue. On remand, applying § 287.220.1 in compliance with *Stewart*, Commission may calculate the liability of Respondents and the liability of the Second Injury Fund (if any) differently than before, hence we shall not undertake to decide, in this opinion, whether there is sufficient competent and substantial evidence to support an award limiting Respondents' liability to only 50 percent permanent partial disability of the body as a whole. It may never be necessary for a reviewing court to decide that question.

Having made our way this far, we now explain why we must reverse the segment of Commission's award calculating the respective liabilities of Respondents and the Second Injury Fund and remand the case to Commission for redetermination of that issue.

■ We start by noting that Claimant's second point, not yet mentioned in this opinion, assigns error in Commission's failure to follow § 287.220.1 and *Stewart* in calculating the respective liabilities of Respondents and the Second Injury Fund. Claimant correctly observes that § 287.220.1 did not require Commission to determine the percentage of Claimant's preexisting disability. Once Commission found Claimant had a disability before Accident 4 and that he was permanently and totally disabled after Accident 4, the next determination Commission should have made was the amount of disability resulting from Accident 4 "considered alone and of itself." That determination would fix the amount owed Claimant by Respondents. Once that amount was ascertained, it would be deducted from the compensation due Claimant for permanent and total disability, and the Second Injury Fund would be liable to Claimant for the difference, if any.

■ When an appellate court reviews an award by Commission in a workers' compensation case, an award based on interpretation

or application of law, rather than a determination of fact, is reviewed for correctness without deference to Commission's decision. *Simmerly v. Bailey Corp.*, 890 S.W.2d 12, 14[2] (Mo.App. S.D.1994), citing *West v. Posten Const. Co.*, 804 S.W.2d 743, 744 (Mo. banc 1991). Findings of ultimate facts reached through application of rules of law rather than by natural reasoning based on facts alone are conclusions of law. *Simmerly*, 890 S.W.2d at 14[3]. Such findings fall within the appellate court's province of review and correction. *West*, 804 S.W.2d at 744[2]; *Davis*, 903 S.W.2d at 571[16].

We hold Commission erred as a matter of law in the way it calculated the respective liabilities of Respondents and the Second Injury Fund. Until Commission calculates the liability of Respondents for Accident 4, considered alone and of itself, as required by § 287.220.1 and *Stewart*, no reviewing court can determine whether an award of compensation to Claimant from the Second Injury Fund is proper.

The portion of Commission's award calculating the respective liabilities of Respondents and the Second Injury Fund is reversed and the case is remanded to Commission for further proceedings consistent with this opinion. To ensure that Commission decides only what is necessary on remand, we again point out that all parties agree with Commission's finding that Claimant had an existing disability prior to Accident 4, and all parties agree with Commission's finding that Claimant, since Accident 4, has been permanently and totally disabled. We affirm those findings.

Commission's task on remand is to start from there and, in compliance with § 287.220.1 and *Stewart*, determine the liability of Respondents for Accident 4, considered alone and of itself, and then determine the liability (if any) of the Second Injury Fund.

■ The final issue confronting us is the claim of error in Claimant's first point. It attacks Commission's rejection—by a two-to-one vote—of the ALJ's ruling that Respondents are liable to Claimant for $43,881.85 for past nursing services provided by his wife at home.[9] The two-commissioner majority rejected the ALJ's ruling on the ground that Claimant failed to request or demand that Respondents provide home nursing care and Respondents did not have adequate notice that Claimant needed such care. The dissenting commissioner found that Claimant's need for home nursing care was obvious and was communicated to the workers' compensation insurer for Claimant's employer.

Claimant maintains the uncontradicted testimony of his wife, Pat, showed Respondents had adequate notice of Claimant's disabling condition and the care he needed. Claimant cites *Stephens v. Crane Trucking, Inc.*, 446 S.W.2d 772 (Mo.1969).

Respondents do not question the value the ALJ placed on the care provided by Pat,[10] nor do Respondents argue that such care was not reasonably required to relieve Claimant from the effects of injuries sustained in Accident 4.[11] Respondents' position is that the two-commissioner majority ruled correctly inasmuch as Respondents received no request for home nursing care prior to the ALJ's hearing, nor did they have notice that Claimant needed such care before the hearing. Respondents rely on *Fitzgerald v. Meyer*, 820 S.W.2d 633 (Mo.App. E.D.1991).

Having set forth the parties' contentions, we turn to the evidence.

Pat testified that the day before she brought Claimant home from the hospital following Accident 4, she talked with Randy Smart, a representative of "Commercial Un-

---

9. That issue is the only one on which Commission was not unanimous. In all other respects, all commissioners agreed on Commission's award.

10. For brevity and clarity, we refer to Claimant's wife by her forename. We mean no disrespect.

11. Section 287.140.1, RSMo 1994, provides:
   "In addition to all other compensation, the employee shall receive and the employer shall provide such medical, surgical ... and hospital treatment, including nursing ... as may reasonably be required after the injury ... to cure and relieve from the effects of the injury...."

ion."[12] According to Pat, she told Smart she "was getting ready to bring [Claimant] home and he was in a wheelchair and bedridden right now." The conversation occurred at Smart's office. Pat explained, "I'd gone to the office to fill out some forms he needed doctors' names and I believe my authorization for medical release."

Pat also testified about a conversation with Vickie Harris "of the Overland Park office" about Claimant's wages and the care he needed. At the time of that conversation, Commercial Union was providing wheelchairs for Claimant. Pat maintained that during this period, Claimant was unable to get up and go to the bathroom. Her testimony continued:

> "Q. Anyway you'd had conversations with Commercial Union claims agents about [Claimant's] general condition during that period of time?
>
> A. Yes, I did."

In addition to Pat's testimony, Claimant points out that Commercial Union made temporary total disability payments from the date of Accident 4 until February 24, 1991, when it denied coverage.

*Stephens,* the case relied on by Claimant, is a workers' compensation case where Commission awarded the injured employee compensation for nursing care provided by his wife. 446 S.W.2d at 773. There, as here, the employer and its insurer maintained the award was improper in that they had no knowledge the employee needed such care. *Id.*

Affirming the award, the Supreme Court explained that during the employee's hospitalization, the first of numerous medical reports from his treating physician was sent to the employer and insurer. The report stated the employee would be permanently disabled. *Id.* at 775. Furthermore, a claims representative of the insurer saw the employee in the hospital. *Id.* When the employee was subsequently discharged, he was bedfast and helpless in a full body cast. *Id.* The Supreme Court held Commission could have

reasonably found from this evidence that the employer and insurer were aware of the disabled condition of the employee and his need for nursing services. *Id.* at 777[1].

Respondents argue *Stephens* is distinguishable from the instant case in that the insurer in *Stephens* had actual knowledge of the employee's need for home nursing care, while here "no representative of [Commercial Union] visited, or had any direct contact, with [Claimant] which would have given [Commercial Union] first hand information regarding any need for in-home nursing services." Respondents insist the facts here are like those in *Fitzgerald,* the case on which they rely.

In *Fitzgerald,* Commission awarded the injured employee compensation for nursing care by his wife at home. 820 S.W.2d at 634–35. The employer and insurer argued this was error because the employee never demanded such care and his need for it was not obvious. *Id.* at 635. The employee returned to work eleven months after the injury. *Id.*

Reversing Commission's award, the Eastern District of this Court held there was no evidence that the employer or insurer had notice of the need for such care and no evidence that the employee demanded it. *Id.* at 635–36.

Claimant attempts to distinguish *Fitzgerald* by arguing that here, Respondents presented no evidence contradicting Pat's testimony, and Commercial Union never denied having knowledge of Claimant's condition and his need for home nursing care.

In denying compensation for nursing care by Claimant's wife, the two-commissioner majority held *Stephens* was not controlling, saying:

> "[*Stephens* ] is distinguishable in that an insurance company agent had visited [the employee] in the hospital and became personally aware of the extent of his injuries. [The employee] also was in a full body cast when released from the hospital. While claimant in this case suffered severe inju-

---

12. Commercial Union Insurance Company is the workers' compensation insurer for Claimant's employer.

ries, they were not as debilitating as those in *Stephens* and there is no evidence that an insurance company agent had witnessed the need for nursing care. For these reasons, the Commission concludes that the employer/ insurer did not have adequate notice of the need for nursing care and absent a demand, the employer/insurer have no liability for past nursing care."

The dissenting commissioner in the instant case believed *Stephens* authorized recovery by Claimant. The dissenter held the evidence demonstrated Claimant's need for home nursing care was obvious and was communicated to Commercial Union by Pat in the testimony recounted earlier.

 The standard of review we apply in this case is discussed earlier in this opinion. In applying it, we note the burden was on Claimant to prove all material elements of his claim. *Meilves v. Morris*, 422 S.W.2d 335, 339[5] (Mo.1968). Consequently, it was Claimant's burden to prove that Respondents were aware of his need for home nursing care. *Stephens*, 446 S.W.2d at 777[1].

The reason that is so is found in *Hawkins v. Emerson Electric Co.*, 676 S.W.2d 872, 880[6] (Mo.App. S.D.1984), which explains:

> "*Anderson v. Parrish*, 472 S.W.2d 452, 457 (Mo.App.1971) ... points out that it is only when the employer has notice that the employee needs treatment, or a demand is made on the employer to furnish medical treatment, and the employer refuses or fails and neglects to provide needed treatment, that the employer is held liable for the medical treatment procured by the employee."

As we have seen, there was no evidence that Claimant ever demanded that Respondents provide home nursing care prior to the ALJ's hearing, nor was there evidence that any representative of Commercial Union ever saw Claimant while he was hospitalized or at home. The only evidence arguably supporting a finding that Respondents were aware Claimant needed home nursing care is Pat's testimony about her conversations with Smart and Harris, and Commercial Union's payment of temporary total disability benefits commencing on the date of Accident 4. While there was evidence that Pat assisted Claimant with personal hygiene, massaged his feet and back, helped him dress, cared for his wounds, supervised his medication, served meals in bed, pushed the wheelchair, and supplied other services, we find nothing in her testimony that clearly establishes she told Smart or Harris she was doing so. Furthermore, there is no evidence that any physician informed Respondents that Claimant needed home nursing care.

Two commissioners found the evidence insufficient to support a finding that Respondents were aware Claimant needed home nursing care. In order to reverse Commission's denial of compensation for home nursing care, we would have to declare the decision of the two-commissioner majority contrary to the overwhelming weight of the evidence.

Such a holding would overstep the boundary of our review. Although it is arguable that Commission could have reasonably found Respondents had adequate notice of Claimant's need for home nursing care, we hold the evidence favorable to such a finding is not so compelling that Commission's finding to the contrary is against the overwhelming weight of the evidence. This issue is one where an appellate court must heed the admonition in *Davis* that a reviewing court may not substitute its judgment on the evidence for that of Commission. 903 S.W.2d at 571. Claimant's first point is denied.

Commission's award is affirmed in all respects except the portion calculating the respective liabilities of Respondents and the Second Injury Fund for Claimant's permanent and total disability. That portion of the award is reversed, and the case is remanded to Commission for a determination of the liability of Respondents for Accident 4, considered alone and of itself, and once that is done, for a determination of the liability, if any, of the Second Injury Fund, all in conformity with the directions given earlier in this opinion.

MONTGOMERY, C.J., and PARRISH, J., concur.