**Meredith SUHR, Respondent,**

v.

**Ash OKORN, Appellant.**

**No. WD 60515.**

Missouri Court of Appeals,
Western District.

Aug. 30, 2002.

Meredith Suhr, Kingston, pro se.

Scott C. Hamilton, Lexington, for Appellant.

Before: BRECKENRIDGE, P.J., and HOWARD and HOLLIGER, JJ.

VICTOR C. HOWARD, Judge.

Ash Okorn appeals from the trial court's judgment granting a full order of protection to petitioner/respondent, Meredith Suhr, pursuant to § 455.040 RSMo 2000. He alleges in his sole point on appeal that there was no credible evidence presented to support the trial court's finding that allegations of abuse or stalking were proven by a preponderance of the evidence pursuant to § 455.040.

We hold that the evidence was insufficient to support the trial court's finding that Ms. Suhr was entitled to an order of protection against Mr. Okorn. Thus, we reverse and remand to the trial court with

directions to vacate the full order of protection entered against Mr. Okorn.

## Background

The parties were previously married and have two children, Ashley and Austin, ages nine and ten, respectively, at the time of the proceedings at issue. They divorced on October 31, 1994.

On August 20, 2001, Ms. Suhr filed an "Adult Abuse/Stalking Petition for Order of Protection"[1] in the Circuit Court of Caldwell County, Missouri, naming Mr. Okorn as respondent. In her petition, which was a "fill-in-the-blank" form, Ms. Suhr alleged that Mr. Okorn had knowingly and intentionally "stalked [her]," "harassed [her]" and "placed or attempted to place [her] in apprehension of immediate physical harm" by "driving past [her] home" on August 19, 2001, and by making "strange calls," the most recent of which was on August 8, 2001.

Judge Chadwick entered an "Adult Abuse/Stalking Ex Parte Order of Protection"[2] on August 20, 2001, and set an August 30, 2001, hearing date on the petition. This order was served upon Mr. Okorn on August 24, 2001.

On August 29, 2001, attorney Scott Hamilton entered his appearance on behalf of Mr. Okorn. At Mr. Hamilton's request, the ex parte order was extended and the cause continued to September 12, 2001.

On September 12, 2001, Judge Chadwick heard evidence on the petition from Ms.

Suhr, her current husband, Mr. Okorn, and Mr. Okorn's current wife. Further details of their testimony are set forth below in our discussion of the issue on appeal. At the close of the hearing, the court found that Ms. Suhr had proven her allegations of abuse under § 455.040 and entered an "Adult Abuse/Stalking Judgment/Full Order of Protection" against Mr. Okorn. The court made no further evidentiary findings. The court ordered Mr. Okorn not to "abuse, threaten to abuse, molest, stalk or disturb the peace of [Ms. Suhr, not to] communicate with [her] in any manner or through any medium[, and not to] enter or stay upon the premises of wherever [she] may reside." The order was made effective until September 11, 2002, unless sooner terminated or extended.

This appeal follows.[3]

## Discussion

 Mr. Okorn challenges the sufficiency of the evidence to sustain the trial court's entry of a full order of protection. Ms. Suhr did not file a Respondent's brief. Pursuant to *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), we must affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. We review the content of the record below in order to determine the sufficiency of the evidence, keeping in mind the trial court's superior ability to evaluate the is-

---

1. This action is governed the "Adult Abuse" Act, §§ 455.010 to 455.085 RSMo 2000.

2. Pursuant to § 455.035.1:
 Upon the filing of a verified petition pursuant to [the Adult Abuse Act] and for good cause shown in the petition, the court may immediately issue an ex parte order of protection. An immediate and present danger of abuse to the petitioner shall constitute

good cause for purposes of this section. An ex parte order of protection entered by the court shall take effect when entered and shall remain in effect until there is valid service of process and a hearing is held on the motion.

3. Section 455.060.1 states in relevant part, "[a]ll full orders of protection shall be final orders and appealable."

sues by the testimony and demeanor of the witnesses. *Wallace v. Van Pelt*, 969 S.W.2d 380, 383 (Mo.App. W.D.1998).

Section 455.020.1 of Missouri's Adult Abuse Act states that "[a]ny adult who has been subject to abuse by a present or former adult family or household member, or who has been the victim of stalking, may seek relief under sections 455.010 to 455.085 by filing a verified petition alleging such abuse or stalking by the respondent." As explained in our discussion of this case's background, Ms. Suhr filed a petition pursuant to this section, alleging that she "[had] been getting strange calls" and "[had] possibly sighted Mr. Okorn driving by [her] house late at night at least once."

■ At the September 12, 2001, hearing on Ms. Suhr's petition, Ms. Suhr, to be entitled to a full order of protection, bore the burden of proving her allegations of abuse or stalking by a preponderance of the evidence. § 455.040.1. "'Preponderance of the evidence' is defined as that degree of evidence that 'is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows the fact to be proved to be more probable than not.'" *State Bd. of Nursing v. Berry*, 32 S.W.3d 638, 642 (Mo.App. W.D.2000) (quoting *Vaught v. Vaughts, Inc./S. Mo. Constr.*, 938 S.W.2d 931, 941 (Mo.App. S.D. 1997)). Mr. Okorn maintains that Ms. Suhr did not meet this burden with regard to her allegations against him because she did not prove that he had made the phone calls or that he was the individual driving past her house.

"Stalking" is defined for purposes of the Act at § 455.010(10) as follows:

"Stalking" is when an adult purposely and repeatedly harasses or follows with the intent of harassing another adult. As used in this subdivision, "harasses" means to engage in a course of conduct directed at a specific adult that serves no legitimate purpose, that would cause a reasonable adult to suffer substantial emotional distress. As used in this subdivision, "course of conduct" means a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose. Constitutionally protected activity is not included within the meaning of "course of conduct."

Mr. Okorn argues that the evidence was insufficient to show he engaged in any conduct that met the definition of "stalking" found in the statute. We agree.

Ms. Suhr appeared *pro se* at the hearing on her petition, so the trial court directly questioned her concerning her allegations in the petition. The evidence is somewhat fragmented and difficult to follow, especially as to the specific dates of when the alleged incidents occurred.

Ms. Suhr provided to the court some historical information about her relationship with Mr. Okorn, which, while relevant, is not part of the course of conduct she alleged in her petition. Ms. Suhr testified that she was married to Mr. Okorn until October 31, 1994, and that he had been physically abusive toward her during their marriage. Ms. Suhr also testified that Mr. Okorn had called her at work with comments to "belittle" and "harass" her. After they divorced, Mr. Okorn received custody of their children, but she explained that about a year before the current proceedings DFS had taken the children away from him because of physical abuse allegations. She explained that after DFS placed the children with her, Mr. Okorn and his father continuously called their home insisting to speak to the children, but she told him that any communications should go through DFS.

With regard to the allegations of harassment complained of in the petition, we first consider the phone calls allegedly made by Mr. Okorn. She explained that about a week before the custody modification proceedings began,[4] she "started receiving strange calls [at home] where [she] would answer the phone and there was nobody there." If she gave someone else such as her husband the phone, the caller would hang up. She said that she was receiving these calls as often as twice a day. She claimed that she was "a little bit" concerned about the calls, but her husband, who "has been a police officer for years," was not concerned. Ms. Suhr told the court that after she was given "full custody" of the children, she received more calls, but they were "more sporadic, just here and there." Her husband told her it "might be somebody playing a prank, so [she] didn't really act upon that." On cross-examination, Ms. Suhr admitted that she did not have any proof, "just fear," that the "strange" phone calls came from Mr. Okorn. She admitted that the last time Mr. Okorn had physically harmed her was seven years ago, when they were still married, and he had never threatened to kill her.

The court also questioned Russell Suhr, Ms. Suhr's current husband. With regard to the phone call allegation, Mr. Suhr testified that when DFS placed the children in the Suhr home, both Mr. Okorn and Mr. Okorn's father had called Mr. Suhr at work wanting to see or talk to the kids, but the calls had not included any threats. Mr. Suhr also confirmed that they had received calls at home around the time of the custody dispute, but he did not know who had made the calls. He explained that they had their phone placed out of

service "when the different things began to unfold."

With regard to Ms. Suhr's allegations that she had seen Mr. Okorn driving by her house in his truck late at night, Ms. Suhr explained to the court as follows: She and her husband were on their patio grilling with a friend at around 9:30 p.m. when "[they] saw a truck that [was] identical to the one [they'd] seen [her] ex-husband drive" driving past their house on their gravel road. She said the truck pulled into their next-door neighbors' driveway, with its lights off, and "slowly proceeded back up the road, lights off, [past the house] until they hit about where [Ms. Suhr's] yard meets . . . the neighbor's property." She explained that once the truck passed their house, it turned on its lights, sped up and "drove away at a pretty quick speed." She admitted on cross-examination that she could not see the driver of the truck. However, she claimed to recognize the truck as being identical to one she had seen Mr. Okorn drive, and she said she could tell it was a "man's form" driving. The following exchange then occurred between Mr. Okorn's counsel and Ms. Suhr:

Q: So you have no knowledge that it was Mr. Okorn in the truck?

A: No solid proof, no. Again, only fear.

Q. So there isn't any evidence that you have that you can say to this Court that Mr. Okorn stalked you, harassed you?

A: 100 percent, no. 90 percent.

Mr. Suhr confirmed her testimony. He testified that he recognized the Chevrolet truck as being similar to one driven by Mr. Okorn, but he could not see the driver and

---

4. Ms. Suhr does not indicate, and it is not clear from the record, when the custody mod-

ification proceedings occurred.

could not get to the road quick enough from their porch—about forty-feet—to get a license plate number. He also explained that he could only see a "man's form" in the driver's seat.

Mr. Okorn testified in his own defense. He told the trial court that he had never been physically abusive toward Ms. Suhr during their marriage. He also confirmed that after their divorce he had received custody of the children. However, after later custody proceedings were initiated, he and Ms. Suhr entered into an agreed-upon stipulation concerning the custody of the children.[5] With regard to the phone calls, Mr. Okorn testified that he did not call Ms. Suhr's house on August 8, 2001.[6] With regard to the truck "drive-by" alleged by Ms. Suhr, Mr. Okorn testified that on August 19, 2001, he was on a canoe "float trip" on the Niangua River at Bennett Springs with his wife and friends. His current wife, Connie Okorn, testified that she had never witnessed him make any calls where he did not speak on the phone and that they were on a canoe trip with twelve other people on August 19, 2001.

No further evidence was offered and the court entered its judgment.

On appeal, Mr. Okorn argues that because neither Ms. Suhr nor her husband could positively identify Mr. Okorn as being the caller or the person driving the truck, Ms. Suhr did not prove her case by a preponderance of the evidence. Again, as defined above, " '[p]reponderance of the evidence' is defined as that degree of evidence that 'is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows the fact to be proved to be more probable than not.' " *State Bd. of Nursing*, 32 S.W.3d at 642 (quoting *Vaught*, 938 S.W.2d at 941). On the very limited facts of this case, we agree that Ms. Suhr failed to meet her burden of proof at the hearing on her petition, so she was not entitled to a full order of protection.

With regard to the calls, the record is completely devoid of evidence that the calls Ms. Suhr complains of came from Mr. Okorn. Neither Ms. Suhr nor Mr. Suhr could say Mr. Okorn made the calls. The only evidence offered by Ms. Suhr with regard to the calls was based upon her speculation, which will not suffice to meet her preponderance burden.

What remains is the allegation that Mr. Okorn had driven by her house in his truck at 9:30 at night on August 19, 2001. Even if we accept that a preponderance of evidence was presented to support the court's finding that it was Mr. Okorn who had driven by in the truck, the evidence was insufficient to prove at least two of the required elements of "stalking" under § 455.010(10). First, Ms. Suhr testified that the "drive-by" in the truck occurred on only one occasion, not "repeatedly." *See Wallace*, 969 S.W.2d at 384 (discussing that § 455.010(10)'s "stalking" definition's inclusion of the word "repeatedly" means that "[i]t is not until one engages in harassment more than once that the conduct may constitute stalking"). Second,

---

**5.** Mr. Okorn was not questioned about DFS's involvement and the allegations that he had physically abused his children, nor was he asked about the alleged phone calls made during the custody modification proceedings.

**6.** In support of this testimony, Mr. Okorn introduced his home telephone bill. However, the bill did not reflect the dates of service for when Ms. Suhr had alleged she received the calls, so the court determined the evidence to be "worthless." That exhibit is not a part of the record on appeal, and Mr. Okorn does not challenge the trial court's refusal to admit it.

there was no showing that Mr. Okorn engaged in a "course of conduct," which the statute explains "means a pattern of conduct composed of a *series of acts* over a period of time, however short, evidencing a *continuity of purpose*." § 455.010 (emphasis added).

While we are fully aware of the substantial deference granted to the trial court because of its position to gauge the credibility of the witnesses and our resultant hesitancy to supersede the trial court's discretion in Adult Abuse Act cases, we are equally aware of potential for abuse of the Adult Abuse Act and the stigma that can attach to a respondent who is adjudicated a "stalker." *Wallace* 969 S.W.2d at 383, 387. Even if we grant the trial court the substantial deference due it, the evidence in the record is too scant to support its finding that Ms. Suhr proved her allegations of stalking by a preponderance of the evidence, so reversal is warranted.

## Conclusion

Ms. Suhr did not prove by a preponderance of the evidence that Mr. Okorn engaged in "stalking" her, so the evidence was insufficient to support the trial court's full order of protection against Mr. Okorn under § 455.040. We reverse the judgment and remand to the trial court with instructions to vacate the full order of protection.

BRECKENRIDGE, P.J., and HOLLIGER, J., concur.