**Mark A. PATTERSON,
Petitioner/Respondent,**

v.

**Ronnie PILOT, Respondent/Appellant.**

**No. SD 32266.**

Missouri Court of Appeals,
Southern District,
Division One.

May 28, 2013.

Mark C. Fels, of Springfield, MO, for Appellant.

Respondent Acting Pro Se.

WILLIAM W. FRANCIS, JR., J.

Ronnie Pilot ("Pilot") appeals from a judgment granting Mark A. Patterson ("Patterson")[1] a full order of protection against Pilot, pursuant to the Adult Abuse Act, after a bench trial. Pilot contends there was insufficient evidence to establish all the elements of "stalking" as defined in section 455.010–.090[2] to support the trial court's issuance of a full order of protection. We disagree and affirm.

**Factual Procedural Background**

Patterson, along with his parents, owned real estate in Greene County just south of Strafford, Missouri. Dave Murdaugh ("Murdaugh") owned the land "around" Patterson, including 67 acres that was part of the Patterson "homestead farm," which Patterson had to sell as part of a divorce settlement. Patterson knew Pilot and Larry Fultz ("Fultz")[3] because they were both employed by Murdaugh.

On June 2, 2011, Patterson filed an "Adult Abuse Ex Parte Petition for Order of Protection" ("Petition") against Pilot citing numerous incidents of harassment and stalking by Pilot from February 2011 through May 20, 2011.[4] In his pre-printed Petition, Patterson selected the pre-print-ed options in boxes that alleged Pilot "knowingly and intentionally ... stalked me[,] harassed me[,] followed me from place to place[,] placed or attempted to place me in apprehension of immediate physical harm[, and] threatened to do any of the above[.]"[5] The pre-printed Petition then provided: "BY THE FOLLOWING ACT(S): (STATE THE MOST RECENT DATE(S) OF EACH ACT AND DESCRIBE)[.]" In response, Patterson described the following specific acts in his Petition:

> 6–1–11—Trespass on my place with his step dad Larry Kutz @ Rear of My House & Taking Photo's
>
> 5–20–11 Drove his Bob cat loader at my Truck as to (Ram Me In the Side)
>
> 5–29–11 Lock my Privet Road Easement Gate
>
> 2–16–11 Cut Trees on my property & has told me he would keep up the Vandalism to my place & me (Ronnie knocked off my mailbox)[6]

Patterson also alleged in the Petition that he was afraid of Pilot and there was an "immediate and present danger of abuse or stalking" because: "[Pilot]—told me he was doing the vandalism and harassment because his boss didn't like me. Then said he could do what ever he wanted. He will come Runing at me when I'm on my place & say you got a problem

---

1. Patterson did not submit a brief on appeal. While there is no penalty for that omission, this Court is then forced to adjudicate Pilot's claims of error without the benefit of whatever arguments Patterson might have raised. *McClain v. Kelley*, 247 S.W.3d 19, 23 n. 4 (Mo.App. S.D.2008).

2. All references to statutes are to RSMo 2000, unless otherwise indicated. All rule references are to Missouri Court Rules (2012).

3. Fultz is Pilot's stepfather.

4. Patterson also alleged he had no relationship with Pilot other than Pilot had "stalked [him.]"

5. Patterson did not select the following options as allegations against Pilot: "coerced me," "sexually assaulted me," "unlawfully imprisoned me," or "caused or attempted to cause physical harm[.]"

6. We have shown Patterson's handwritten allegations as written without notations to grammatical or punctuation errors.

with Any Thing & *Threaten me.*" [7] (Underscore in original). Patterson requested the court, pursuant to section 455.010–.085, issue an ex parte order of protection restraining Pilot from "abusing, threatening to abuse, molesting or disturbing the peace of [Patterson] wherever [Patterson] may be found."

The court denied Patterson *ex parte* relief and set a hearing on the full order of protection for June 16, 2011, which was continued several times until August 9, 2012.[8] Viewed most favorably to the judgment, the testimony and evidence revealed the following facts.

On August 9, 2012,[9] Patterson affirmed he alleged in his Petition that Pilot stalked him, harassed him, followed him from place to place, and attempted to cause him physical harm. The incidents involving Pilot and Patterson had been ongoing for about three years. Patterson testified to numerous incidents of Pilot trespassing on his property, blocking him in his driveway with a bobcat loader or his body so that Patterson could not leave, following him up and down his 35–foot driveway, and piling rocks and limbs across his driveway to block it. As a result of these acts, law enforcement was called on several occasions.

Patterson testified being videotaped and photographed was a regular, every day occurrence and that Pilot was one of those videotaping or photographing him. He stated Pilot, and others, would come to his property line and stand there for hours videotaping him whenever he left his house. Patterson testified that Pilot, Fultz, and others had videotaped and photographed him 50 to 75 times on and off his own property.

As to specific dates of the alleged incidents, Patterson testified Pilot drove a bobcat loader at his truck on May 20, 2011; Pilot blocked his driveway on May 31, 2011; on June 1, 2011, Pilot and Fultz came up to his house on a 4–wheeler, "30 foot on my place," and took photos of, and messed with his tractor; and 2½ years ago, threw barbwire on his truck. Patterson was questioned regarding the last significant incident, which occurred on June 27, 2012.[10]

Patterson testified that on June 27, 2012, he left his house to go to the hospital to stay with his mother and as he was coming down his drive, "there was [sic] about four or five people sitting on the edge of my driveway, in my driveway." Rocks and limbs had been piled "all the way across the drive" so Patterson could not get out of his driveway. When Patterson attempted to go around the debris, Pilot and Fultz blocked his truck and were "[l]iterally standing in front of me, in front of my truck, behind my truck" keeping him from going anywhere for 15–20 minutes. Patterson "took photos of the rocks they had piled in my driveway[,]" because "[he] knew that they were getting ready to

7. Again, we have shown Patterson's handwritten allegations as written, as best we can discern, without notations to grammatical or punctuation errors.

8. In his Petition, Patterson identified Larry Fultz as Larry "Kutz." This was corrected on the record at the hearing on August 9, 2012.

9. Patterson had a separate full order of protection action pending against Fultz, and the parties agreed to present testimony in both cases to the trial court. However, the trial court was going to "consider each case separately and mak[e] a decision on each case as a separate matter." We refer to evidence regarding Fultz only as necessary to address Pilot's appeal as to Patterson.

10. Pilot objected on the ground that this incident was not alleged in the original Petition and Patterson had not filed an amended petition. The trial court overruled the objection.

do more damage to the drive." Patterson stated he was finally able to leave and went down to his parents' house and called 911. He then went back to his driveway to wait for an officer and noticed more rocks had been "piled in the road," and took more photographs. Pilot also "started scooping up my driveway with a bobcat and taking my gravel out and dumping it on Murdaugh's place." Pilot then "raised it up, came back, and come [sic] straight at my truck, and stopped maybe about a foot away from the side of my truck with a bucket raised at my head height." Patterson was probably about three or four feet back when Pilot raised up the bucket and came at him real fast and then "stopped real quick."

The photographs Patterson took of the rocks piled in his driveway, of Pilot and Fultz, and of the confrontation on June 27, were entered into evidence.

When asked if the June 27, 2012 incident scared him, Patterson answered, "Yeah." Specifically, Patterson testified that he was afraid of Pilot [11] because his health was not good, and they have "came [sic] at [him] with tractors, frame loaders, with bobcats, with dozers … a 150,000–pound dozer or … a 60,000–pound bobcat, and you are in a truck or can't walk." In addition, Fultz made a comment "that he would kill me." Patterson testified that Pilot "has come at me," threatened him, and told him they were going to make Patterson's "life miserable." Pilot told Patterson the reason for all of the harassment was because Patterson was giving Murdaugh a "hard time"

over an easement.[12] According to Patterson, ninety percent of the altercations happened on the "private driveway easement that goes back and forth to [his] house." [13]

On cross-examination, Patterson admitted he had no "independent recollection of dates[,]" but could refresh his recollection by viewing photographs he had taken.

Fultz testified and admitted on cross-examination that he and Pilot had been photographing and videotaping Patterson upon Murdaugh's instructions since early 2011 because Patterson had made allegations that they were stalking and harassing him.

Pilot testified as well and generally denied harassing, stalking, threatening or placing Patterson in "fear of immediate physical harm." He testified the only contact he had with Patterson was when he "comes out to where we are," and as for the trespass allegations, Pilot testified they were on Murdaugh's property photographing Patterson's tractor due to some damage to Murdaugh's hayfield. Pilot denied he had ever driven his bobcat loader at Patterson's truck or cut any trees on Patterson's property, and that any trees cut, were on Murdaugh's side of the easement. Pilot denied threatening Patterson or ever telling Patterson that the vandalism and harassment were because Murdaugh did not like him.

Pilot testified as to the June 27, 2012 incident, and indicated he had videotape and pictures clearly showing Patterson blocking their tractor with his truck, driving up and down the driveway, and turning

11. Patterson also testified to being afraid of Fultz.

12. Patterson testified he had a separate lawsuit pending with Murdaugh regarding an easement.

13. Patterson also testified about an incident on July 27, 2012, involving a dark truck com-

ing down the road as he was pulling up to his mailbox. The truck crossed the yellow line into Patterson's lane and "hit" Patterson. During cross-examination, Patterson testified he "found out later it was Mr. Fultz" involved in this incident. There was no testimony that Pilot was involved in this incident.

around and coming back. The trial court partially viewed the video and indicated it would accept Pilot's testimony that there were pictures showing this activity, but also made the following comments:

THE COURT: You know, I am not cutting anybody off. I don't want you to lose sight of the fact this is about an order of protection.

. . . .

THE COURT: And some of that would be much more interesting when and perhaps if—maybe it's when—[Fultz] and [Pilot] seek an order of protection against [Patterson]. That may be next. I probably expect that's coming next.

. . . .

THE COURT: But that's not the point today.

Pilot further testified he did not block Patterson from the driveway on June 27, 2012, rather Patterson tried to block Pilot and Fultz from crossing.

On cross-examination, Pilot was asked by Patterson's counsel, "[W]ould you be in agreement to staying away from my client?"[14] At that point, the trial court interjected and asked if Patterson was "willing to dismiss his claim for an order of protection with that agreement?" A discussion was held off the record. The following colloquy then took place on the record:

[PATTERSON'S COUNSEL]: Only if it was judicially noticed as that they were agreeing to stay away.

THE COURT: Let's make a couple of things clear. Your client can dismiss his petition upon that agreement, or the respondents can consent to an order of protection which they have no intention of doing, or I can hear the evidence and make a ruling. The fact that the re-

spondents are willing to stay away is of no consequence.

[PATTERSON'S COUNSEL]: Okay. Only if they are willing to consent, Judge.

[PATTERSON'S COUNSEL TO PILOT]: Would you be willing to consent to stay away?

[PILOT'S COUNSEL]: Your Honor, I object.

THE COURT: The objection is sustained. They are here defending the case. That means that they are not consenting.

[PILOT'S COUNSEL]: Sure.

[PILOT]: Can I state that we would never make any contact with him? I mean, we have to go over to do the hay. So—but we don't go up and around his property.

THE COURT: If you all want to take a few moments and discuss that, and if [Patterson] believes that, that may be fine.

[PATTERSON'S COUNSEL]: It might speed the case up, Judge.

THE COURT: Unfortunately—I'll say this on the record—unfortunately, the law does not allow me to enter an order of protection both ways. If it did, I would be doing it. But you can expect—you may discuss with your client—given the testimony I have heard today, he will likely be the respondent in the next filed order of protection.

[PATTERSON'S COUNSEL]: Yes, Judge.

THE COURT: Perhaps you all want to take about five minutes and discuss this. And I know [Pilot's Counsel] has been through this several times before. But let's just take a recess for about five minutes and give you all a chance to

14. Patterson's counsel had asked Fultz the same question on cross-examination.

discuss whether or not you can resolve this.

[PATTERSON'S COUNSEL]: Thank you, Judge.

THE COURT: All right. Why don't you get down and go talk to them and see if you can make this work.

(Witness left the stand.)

(A recess was taken.)

THE COURT: Okay. We're back on the record after a short recess. [Patterson's Counsel] it doesn't sound like you all were able to work out any compromise agreement.

[PATTERSON'S COUNSEL]: No, Your Honor.

THE COURT: That doesn't surprise me. You may continue your inquiry.

Patterson's only rebuttal witness was his father, Richard Patterson, who testified he had witnessed harassment consisting of "[b]locking our easement and stuff so we had to bring down my heavy equipment to clean it back up. You know, push trees out of it, and dumping loads of debris, construction trash in it." He testified he would be at his son's home and would see Pilot taking video and photographs.

At the close of all the evidence, the trial court made the following comments:

THE COURT: Okay. The Court has heard the evidence in the case. And I will be honest. Much of it was irrelevant to the issues presented by an order of protection. It may be very relevant—and I suspect I'll have a chance to hear it all again—when we have a trial on the issues of the easement.

Today it is about [Patterson]'s claim, for an order of protection against each of the respondents. It is not about their claim against him. And it is not so much about their claim that perhaps he provokes them into some of the activities, which I would be inclined to believe.

As I mentioned earlier on the record, before you made some effort to try to resolve this on your own, the Court does not have authority to grant an order of protection both ways. If I did, I would do so. Because I am aware from this case, and I'm aware from the other case that's been pending and the many hearings we've had in that case and the summary judgment in that case, that there is a serious problem brewing between the Pattersons and the Murdaughs and the extent to which [Fultz] and [Pilot] are involved on behalf of the Murdaughs.

This is also not about videotaping each other or taking pictures of each other. Quite frankly, that's not the subject of an order of protection either, except to the extent someone threatens to harm someone.

*Since these people are not related, the only real issue here is stalking.* "Stalking" is defined quite clearly in the statute as: When there is an unwanted course of conduct that causes alarm to another person, and a reasonable person would be alarmed by that conduct. "Alarm" is a fear of danger and physical harm.

Quite frankly, the Court would make a finding of fact that that [sic] conduct has been engaged in here by each of the respondents, perhaps—although not at issue today—by the petitioner as well. So that's something to consider.

But there has been considerable evidence of blocking the driveway in various manners, of standing in front of a truck on more than one occasion, of yelling through the window, of making threats, of following up and down the driveway, perhaps following on public roadways. There's been specific evidence that both—and I was careful to write down who did what when—but

both came at [Patterson]'s truck with and/or a bulldozer or a bobcat and a tractor at various times. [Patterson] testified that [Fultz] claimed one time that he would kill him.

On 6–27 [Patterson] testified that [Pilot] came at him with a bobcat, and that on the same date [Fultz] came close to hitting him. I make no judgment as to what occurred on the public road as to who decided they would cross the center line and how you managed to either slap mirrors or whatever happened there. That's for some other person to decide.

I find it credible that perhaps [Pilot] also said that they were doing all these activities at the request of or because of [Murdaugh]'s easement trouble. And it's kind of a shame that [Fultz] and [Pilot] are doing things at the request of their employer which have gotten them into this.

I believe it's credible when [Patterson] testifies that, one, [Pilot], you, in particular, said you would make his life miserable.

I am very concerned of what's going on here. I am very concerned that someone is getting ready to be hurt. And I am not going to deny the petitioner an order of protection in this environment.

So, based on those findings of fact, the Court makes a finding that it is appropriate to enter an order of protection in favor of the petitioner and against each of the respondents separately. The Court has heard evidence as to each of them separately.

So that's where we are. I will be entering a full order of protection. I think each of you lawyers need to describe to your clients what an order of protection means.

[Pilot's Counsel] that's easy for you because it's going to be in writing.

[Patterson's Counsel] you need to describe to your client that he has a fundamental misunderstanding of what that easement is all about and what that road is all about. And he does not have a right to keep them from using the road. He needs to keep his truck out of the way, let them get their farm equipment up and down the road, and use it as they wish because that's not his property. I think he misunderstands that, or he wouldn't be behaving this way.

So, if nothing further for the record, we will be off the record.

(Emphasis added).

On August 9, 2012, the trial court entered a "Full Order of Protection" ("Order"). The trial court found that, "The matter was heard and submitted to the court which, after due consideration, finds pursuant to section 455.040, RSMo, that [Patterson] has proved the allegations of abuse or stalking." The trial court ordered Pilot "be restrained from committing further acts of abuse or threats of abuse," and be "restrained from any contact with [Patterson]." The Order was to be in effect "until August 8, 2013, unless sooner terminated or renewed." This appeal followed.

■ Pilot's sole point relied on claims the following error:

THE TRIAL COURT ERRED IN ENTERING A FULL ORDER OF PROTECTION AGAINST APPELLANT RONNIE PILOT BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO ESTABLISH ALL THE ELEMENTS OF STALKING AS THAT TERM IS DEFINED IN THE ADULT ABUSE ACT, SECTIONS 455.010 TO 455.909, RSMo, IN THAT STALKING IS THEREIN DEFINED TO OCCUR WHEN AN ADULT PURPOSELY AND REPEATEDLY ENGAGES IN

AN UNWANTED COURSE OF CONDUCT THAT CAUSES ALARM TO ANOTHER PERSON WHEN IT IS REASONABLE IN THAT PERSON'S SITUATION TO HAVE BEEN ALARMED BY THE CONDUCT; "COURSE OF CONDUCT" MEANS A PATTERN OF CONDUCT COMPOSED OF REPEATED ACTS OVER A PERIOD OF TIME, HOWEVER SHORT, THAT SERVES NO LEGITIMATE PURPOSE; "REPEATED" MEANS TWO OR MORE INCIDENTS EVIDENCING A CONTINUITY OF PURPOSE; AND "ALARM" MEANS TO CAUSE FEAR OF DANGER OF PHYSICAL HARM;" AND THERE WAS INSUFFICIENT EVIDENCE THAT:

 (A) APPELLANT PURPOSELY AND REPEATEDLY ENGAGED IN AN UNWANTED COURSE OF CON DUCT THAT CAUSED ALARM TO RESPONDENT WHEN IT WAS REASONABLE IN RESPONDENT'S SITUATION TO HAVE BEEN ALARMED BY SUCH CONDUCT;

 OR THAT

 (B) APPELLANT ENGAGED IN A PATTERN OF CONDUCT COMPOSED OF REPEATED ACTS OVER A PERIOD OF TIME THAT SERVED NO LEGITIMATE PURPOSE.

The point obviously contains multiple potential claims of error.[15] It appears that Pilot is alleging there was insufficient evidence to establish that: (1) Pilot was "stalking" Patterson as defined by section 455.010.13, or (2) Pilot engaged in the "course of conduct" element of stalking as defined in section 455.010.13(b).

The issue for our determination is whether there was substantial evidence to support the trial court's decision to issue a full order of protection against Pilot.

**Standard of Review**

■ In light of the harm that can result in abusing the Adult Abuse Act and its provisions, including the stigma that may attach to an individual labeled a "stalker," "trial courts must exercise great care to ensure that sufficient evidence exists to support all elements of the statute before entering a full order of protection." *Skovira v. Talley*, 369 S.W.3d 780, 781 (Mo.App. S.D.2012) (internal quotations and citations omitted). "Nevertheless, we presume the trial court's judgment is correct, and [Pilot] bears the burden of proving it erroneous." *Id.*

■ Our review of the entry of a full order of protection is governed by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *Schwalm v. Schwalm*, 217 S.W.3d 335, 336 (Mo.App. E.D.2007). We, therefore, will uphold the trial court's judgment as long as it is supported by substantial evidence, it is not against the weight of the evidence, and it does not erroneously declare or apply the law. *Id.* In reviewing the trial court's judgment, we view all facts and inferences in a light most favorable to the judgment and defer to the trial court's determination of credibility. *Id.*; *Binggeli v. Hammond*, 300 S.W.3d 621, 623 (Mo. App. W.D.2010). We defer to the trial court's credibility determinations as " '[t]he trial judge is in the best position to gauge the credibility of the witnesses and

---

**15.** "Points relied on containing multifarious claims violate Rule 84.04(d) and ordinarily are subject to dismissal." *Day v. State*, 208 S.W.3d 294 (Mo.App. S.D.2006) (multifarious points preserve nothing for appellate review). Although Pilot's point is multifarious, we review it *ex gratia*.

to determine the existence of any reasonable apprehension of abuse that a petitioner may harbor; conversely, the judge can determine whether a given respondent appears capable of the feared abuse.'" *Skovira*, 369 S.W.3d at 782 (quoting *Parkhurst v. Parkhurst*, 793 S.W.2d 634, 636 (Mo. App. E.D.1990)).

## Analysis

Patterson's Petition alleged he had no relationship with Pilot other than Pilot stalked him. Section 455.020 provides that "[a]ny adult who has been subject to domestic violence by a present or former family or household member, or who has been the victim of stalking, may seek relief ... by filing a verified petition alleging such domestic violence or stalking by the respondent." Since Patterson and Pilot do not fall within any of the definitions of what constitutes a family or household member, Patterson could only seek an order of protection based upon an allegation of stalking.[16] *See* § 455.020; *Dennis v. Henley*, 314 S.W.3d 786, 789 (Mo.App. S.D. 2010).

■ "Stalking" is defined in section 455.010.13:

"Stalking" is when any person purposely and repeatedly engages in an unwanted course of conduct that causes alarm to another person when it is reasonable in that person's situation to have been alarmed by the conduct. As used in this subdivision:

(a) "Alarm" means to cause fear of danger of physical harm;

(b) "Course of conduct" means a pattern of conduct composed of repeated acts over a period of time, however short, that serves no legitimate purpose. Such conduct may include, but is not limited to, following the other person or unwanted communication or unwanted contact; and

(c) "Repeated" means two or more incidents evidencing a continuity of purpose.[17]

In order for Patterson to prove he was entitled to a full order of protection, he had to present substantial evidence that Pilot purposely and repeatedly, meaning two or more incidents, engaged in an unwanted course of conduct that served no legitimate purpose; that caused a fear of danger of physical harm to Patterson; and that it was reasonable for Patterson to have a fear of physical harm. *See* § 455.010.13; *Glover v. Michaud*, 222 S.W.3d 347, 352 (Mo.App. S.D.2007). Patterson had the burden of proof to establish the allegation of stalking by a preponderance of the evidence to the trial court, *see Schwalm*, 217 S.W.3d at 337, while on ap-

16. This was clearly the trial court's finding, as well as evidenced by the trial court's comments at the close of evidence, that "[s]ince these people are not related, the only real issue here is stalking."

17. It is important to note that the Adult Abuse Act was not intended to be a solution for minor arguments between adults. Prior courts have warned us that there is great potential for adults to abuse the stalking provision of the Adult Abuse Act:

The potential for abuse of the stalking provision of the Adult Abuse Act is great. And, the harm that can result is both real and significant, not the least of which will be

the stigma that attaches by virtue of a person having been found to be a stalker. Moreover, such a finding could lead to criminal prosecution for violation of the criminal stalking statute, § 565.225. Thus, it is incumbent that the trial courts exercise great vigilance to prevent abuse of the stalking provisions in the Adult Abuse Act and in making sure that sufficient credible evidence exists to support all elements of the statute before entering a protective order. *Wallace v. Van Pelt*, 969 S.W.2d 380, 387 (Mo.App. W.D.1998); *see also Schwalm*, 217 S.W.3d at 337.

peal, Pilot bears the burden of proving the trial court's judgment is erroneous. *See Skovira,* 369 S.W.3d at 781.

In Pilot's point, he contends the trial court erred in: (1) granting the full order of protection on the basis of stalking because Patterson failed to meet his burden of showing Pilot was "stalking" Patterson as defined by section 455.010.13; and (2) Patterson failed to meet his burden of showing Pilot was engaged in the "course of conduct" element of stalking as defined in section 455.010.13(b). Specifically, Pilot argues Patterson "offered no testimony that he was afraid or in fear of physical harm on any of the particular occasions alleged in his Petition." Pilot also argues Patterson failed to meet his burden of establishing the conduct complained of served "no legitimate purpose" because the "only times [Patterson] encountered [Pilot] in relation to any of the incidents alleged to be the basis for stalking were when [Pilot] was on [Murdaugh's] property for the legitimate purpose of performing work[.]" We disagree.

 To establish stalking, Patterson had to present substantial evidence that: (1) Pilot's unwanted course of conduct and threats caused alarm to him; and (2) a reasonable person under the same circumstances would have been alarmed by Pilot's conduct. § 455.010.13; *Glover,* 222 S.W.3d at 352. "Alarm" is defined as causing "fear of danger of physical harm," and proof of alarm requires a subjective and an objective component. § 455.010(13)(a).

At trial, there was not only specific testimony that Patterson was afraid of Pilot and why he was afraid of Pilot, but also evidence from which the trial court could reasonably infer that Pilot's conduct caused Patterson to fear physical harm which a reasonable person would have feared under the same circumstances. *See Skovira,* 369 S.W.3d at 786 (evidence that appellant violated three military no-contact orders and his behavior was "continuing, unpredictable and escalating" was substantial evidence from which the trial court could infer appellant's conduct caused respondent to subjectively fear physical harm). Patterson testified he was afraid of Pilot and when asked if the June 27, 2012 incident—when Pilot came towards him with a bobcat loader—scared him, Patterson answered "Yeah."[18] Patterson also gave the trial court two *specific* reasons why he was afraid of Pilot: because

---

18. Pilot argues the June 27, 2012 incident was similar to a "forced confrontation" as found in *Dennis,* 314 S.W.3d at 786, because Patterson was able to leave the encounter and go to his parents' house to call 911, and "[i]t would not seem reasonable for a person in that situation to be in fear of danger of physical harm when he could so easily extricate himself from—and, by choice, return to—the situation." This argument ignores several facts.

First, Patterson believed the situation required the assistance of law enforcement. He testified he wanted to call 911 because he was fearful they were going to do more damage to the drive. However, Pilot took actions to keep Patterson from leaving for 15–20 minutes. When Patterson was finally able to reach his parents' home, he did call 911.

Second, when Patterson went back to the scene to wait for an officer, Pilot was scooping up the gravel from Patterson's driveway with a bobcat and dumping it on Murdaugh's property. Pilot then raised the bucket of the bobcat and came within a foot of Patterson's truck.

Finally, this situation is unlike *Dennis,* which involved only one single incident. Here, these confrontations had been going on for three years and were not "forced" by Pilot. *See Dennis,* 314 S.W.3d at 791 (concluding Dennis was the aggressor in provoking the encounter with Henley by going to where Henley and his wife were stopped and blocked in, therefore, Henley did not say or do anything to cause Dennis to be placed in fear of physical harm).

his health was not good, and Pilot and Fultz have "came [sic] at [him] with trac-tors, frame loaders, with bobcats, with dozers ... a 150,000–pound dozer or ... a 60,000–pound bobcat, and you are in a truck or can't walk."

There was not simply one incident involving Pilot and Patterson discussed at trial. Rather, Patterson gave accounts of incidents with Pilot that began three years prior to trial, including Pilot following Patterson from place to place, trespassing on his property, blocking him in his driveway with a bobcat loader or his body so that Patterson could not leave, following him up and down his 35–foot driveway, engaging in violent acts towards Patterson, and piling rocks and limbs across his driveway to block it. Patterson also testified to being videotaped and photographed by Pilot and others for hours, up to 50 to 70 times, on and off his own property. In addition, Pilot made specific threats that he would make Patterson's life miserable. This testimony provided substantial evidence from which the trial court could reasonably conclude that Pilot's conduct caused Patterson to fear physical harm and that a reasonable person would have feared physical harm under the same circumstances. *See S.D. v. Wallace*, 364 S.W.3d 252, 257–58 (Mo.App. S.D.2012) (noting appellant did not claim or show evidence that K.W. was following her, engaged in violent acts, made any gestures or communicated anything specific that would cause a reasonable person to believe he was in danger, and therefore did not show substantial evidence of elements of stalking).

In support of his argument that Patterson failed to establish "alarm," Pilot relies on *Glover*, 222 S.W.3d at 347, a case in which Glover, a former witness against Michaud, testified that Michaud threatened him with bodily harm and harm to his property, so he needed protection. *Id.* at

349. Glover testified to one incident when Michaud backed his truck toward Glover, threatened him, and sprayed gravel on his car. The only other contact Glover had with Michaud was about two months later when Michaud "blocked the road." In response, Michaud testified Glover was following behind him on the highway when Michaud slowed down on the highway to make a turn. *Id.* at 350.

Here, Pilot's reliance on *Glover* is misplaced because Patterson proved Pilot's conduct over three years caused him fear of danger of physical harm when he specifically testified that he was afraid and provided the reasons for his fears. In *Glover*, we noted that "[a]t no point in Glover's testimony did he ever testify that he was afraid of Michaud or feared being physically harmed by him[,]" nor was there substantial factual evidence that an objective person in the same circumstances would fear physical harm. *Id.* at 352. In addition, we found there was no substantial proof that Michaud engaged in the required "course of conduct" element of stalking because there was testimony of only one incident involving the parties. *Id.* Unlike *Glover*, Patterson testified to being afraid due to *more than one* mere threat during the course of *one* argument. He testified to more than three years of threats, trespassing, blocking, following, being photographed for hours and hours, and destruction to his driveway.

"The trial judge is in the best position to not only gauge the credibility of the witnesses, but also to 'determine the existence of any reasonable apprehension of abuse that a petitioner may harbor; conversely, the judge can determine whether a given respondent appears capable of the feared abuse.'" *Skovira*, 369 S.W.3d at 786 (quoting *Parkhurst*, 793 S.W.2d at 636). Clearly, the trial court believed Patterson was reasonably fearful of physical harm by Pi-

lot. This is evident by the trial court's express finding that Patterson was credible, and that Pilot threatened to make Patterson's life miserable. Second, the trial court expressed in its comments that the court was "very concerned" with what was going on, and "very concerned" that someone was going to get hurt.

Therefore, we find Patterson offered substantial testimony that he was afraid or in fear of physical harm from Pilot.

Pilot also argues Patterson failed to meet his burden of establishing the conduct complained of served "no legitimate purpose" because Patterson encountered Pilot on his employer's property for the legitimate purpose of performing work. " 'Course of conduct' means a pattern of conduct composed of repeated acts over a period of time, however short, that serves no legitimate purpose. Such conduct may include, but is not limited to, following the other person or unwanted communication or unwanted contact[.]" § 455.010.13(b). For support, Pilot cites *C.B. v. Buchheit*, 254 S.W.3d 210 (Mo.App. E.D.2008), a case in which the Eastern District found the "repeated" trips to victim's residence and contact with victim were for the legitimate purpose of Buchheit picking up her granddaughter and facilitating visitation. *Id.* at 212–13.

In *Buchheit*, the repeated contact was necessary and served a legitimate purpose to pick up the child and to facilitate visitation. Here, Pilot had contact with Patterson as part of his employment. However, Pilot's conduct of repeatedly following, videotaping and photographing Patterson; trespassing on Patterson's property; blocking Patterson in his driveway; piling rocks and limbs across his driveway; driving his bobcat at Patterson's truck with him inside; and verbally threatening Patterson, do not serve the legitimate purpose of Pilot performing work. Although Pilot

may have been on employer's property to perform work, his actions and conduct towards Patterson went beyond what could be considered legitimate work related to "haying or working with surveyors."

The evidence in the case at bar, including the inferences from that evidence, viewed in a light most favorable to the trial court's judgment, constituted substantial evidence that Pilot purposely and repeatedly engaged in a course of conduct that served no legitimate purpose and actually caused alarm to Patterson and that would have caused alarm to a reasonable person. The trial court did not err in granting a full order of protection. Pilot's point is denied. The judgment of the trial court is affirmed.

GARY W. LYNCH, P.J., and NANCY STEFFEN RAHMEYER, J., concur.