

# Missouri Court of Appeals

## Southern District

### Division Two

JOHN SCOTT LAWYER,                    )
                                      )
    Petitioner-Respondent,            )
                                      )
vs.                                   )    No. SD33448
                                      )
KIMBERLY DIANE FINO,                  )    **Filed:  May 6, 2015**
                                      )
    Respondent-Appellant.             )

### APPEAL FROM THE CIRCUIT COURT OF STONE COUNTY

Honorable Mark A. Stephens, Associate Circuit Judge

**REVERSED**

Kimberly Diane Fino ("Mother") appeals from the trial court's entry of a full order of protection against Mother in favor of John Scott Lawyer ("Father"). Mother argues there was insufficient evidence to support the trial court's finding of abuse or stalking under the Missouri Adult Abuse Act. *See* § 455.020.[1] Mother's arguments are correct, and the trial court's judgment is reversed.

### Standard of Review

Review of the grant of a full order of protection under the Adult Abuse Act is under the same standard as any other court-tried case; that is, this Court "will uphold the trial court's judgment as long as it is supported by substantial

---

[1] All statutory references are to RSMo Cum. Supp. (2013).

evidence, it is not against the weight of the evidence, and it does not erroneously declare or apply the law." ***Patterson v. Pilot***, 399 S.W.3d 889, 897 (Mo. App. S.D. 2013). The facts and inferences are viewed in the light most favorable to the trial court's ruling. ***Id.*** However, "[i]t is important to note that the Adult Abuse Act was not intended to be a solution for minor arguments between adults." ***Washburn v. Kirk***, 437 S.W.3d 831, 833 (Mo. App. S.D. 2014). There is a great potential for abuse, and real harm can result from improper use of the Act, "not the least of which will be the stigma that attaches by virtue of a person having been found to be a stalker." ***Id.*** (quoting ***Patterson***, 399 S.W.3d at 898 n.17). For those reasons, courts must "exercise great vigilance to prevent abuse of the stalking provisions in the Adult Abuse Act and in making sure that sufficient credible evidence exists to support all elements of the statute before entering a protective order." ***Id.*** (quoting ***Patterson***, 399 S.W.3d at 898 n.17).

### Factual and Procedural Background

Mother and Father were married and had two children together. Mother and Father divorced in 2007 and experienced many subsequent conflicts regarding their children.

On May 27, 2014, Father filed a petition for an adult order of protection under the Missouri Adult Abuse Act. On June 10, 2014, the trial court held a hearing regarding the petition. The parties appeared and tried the case without the assistance of lawyers.

Father testified that Mother sent him numerous threatening text messages that disrupted his home and his work. Father also stated that on May 26, 2014,

2

there had been a prowler at his home.  Father explained that he filed a police report regarding the incident, but was unable to identify the prowler.

Father also submitted into evidence copies of some of the text message conversations between himself and Mother.[2]  The exhibits show a handful of text exchanges regarding the children's health and education.  On May 27, 2014, Mother texted Father regarding an appointment with an eye doctor that the children were scheduled to attend.  Later that evening, Mother texted Father expressing dismay that Father had let the children sleep outside in a tent with no adult supervision and that Father had let one of the children eat foods containing gluten when, according to Mother, that child was supposed to be on a gluten-free diet.  A series of texts during the afternoon of May 29, 2014, involved the dates for visitation in the summer.  During the evening of May 29, 2014, Mother sent Father a number of texts regarding a motion to modify child custody which Father had filed.  On June 2, 2014, Mother sent Father a series of text messages regarding the fact that Father did not take the children to summer school.

After admitting the text messages into evidence, the trial court permitted Mother to testify.  Mother stated the text messages were all about the children, and denied that she had been the prowler at Father's house.

A full order of protection was entered on June 10, 2014.  The trial court found Father had proven domestic violence or stalking.  Mother appeals.

### Discussion

The Missouri Adult Abuse Act provides that "[a]ny person who has been subject to domestic violence by a present or former family or household member,

---

[2] The full text of Father's exhibits is reproduced in the appendix to this opinion.

3

or who has been the victim of stalking, may seek relief under sections 455.010 to 455.085 by filing a verified petition alleging such domestic violence or stalking by the respondent." § 455.020.1. As Mother and Father had been married at one time, they meet the statutory definition of family or household member. *See* § 455.010(7) (defining family or household member to include, *inter alia*, former spouses). Thus, Father could seek a full order of protection under either ground listed in the statute. *Compare **Cuda v. Keller***, 236 S.W.3d 87, 90 (Mo. App. W.D. 2007) (noting that family members do not need to prove stalking in order to obtain a full order of protection), *with **Fowler v. Minehart***, 412 S.W.3d 917, 921 (Mo. App. S.D. 2013) (noting that a petitioner who did not allege the defendant was a family or household member was limited to seeking an order of protection under the stalking provision of the statute). It is not apparent as to which ground the trial court relied upon, and Mother challenges both grounds in her point relied on.[3] Each ground will be addressed in turn.

### *Abuse*

In the first portion of her sole point relied on, Mother argues there was no evidence presented to show abuse because the text messages did not cause substantial emotional distress, would not cause a reasonable person to suffer substantial emotional distress, and served a legitimate purpose. Based on the plain language of the statute and the case law interpreting that statute, Mother is correct.

---

[3] "Points relied on containing multifarious claims violate Rule 84.04(d) and ordinarily are subject to dismissal." *Patterson*, 399 S.W.3d at 897 n.15. Nevertheless, we exercise our discretion to review the point because the deficiency does not impede our ability to understand the nature of Mother's claims. *See **Levine v. Schmidt***, 421 S.W.3d 465, 470 (Mo. App. S.D. 2013).

Under Chapter 455, the term "[a]buse" encompasses assault, battery, coercion, harassment, sexual assault, or unlawful imprisonment. § 455.010(1). Here, there were no allegations of assault,[4] battery, coercion, sexual assault, or unlawful imprisonment, so the resolution of this issue depends on the definition of the term "[h]arassment." The statute defines the term "[h]arassment" as follows:

> a purposeful or knowing course of conduct involving more than one incident that alarms or causes distress to an adult or child and serves no legitimate purpose. The course of conduct must be such as would cause a reasonable adult or child to suffer substantial emotional distress and must actually cause substantial emotional distress to the petitioner or child.

§ 455.010(1)(d). The statutory definition of harassment requires proof of two things: that the conduct was "such as to cause a reasonable person to suffer substantial emotional distress" and that the conduct "actually cause[d] such distress to the petitioner." *C.B. v. Buchheit*, 254 S.W.3d 210, 213 (Mo. App. E.D. 2008). To meet this requirement, the petitioner must show "something markedly greater than the level of uneasiness, nervousness, unhappiness or the like which are commonly experienced in day to day living." *Id.* (quoting *Wallace v. Van Pelt*, 969 S.W.2d 380, 386 (Mo. App. W.D. 1998)). For example, harassment has been found where there was physical contact and an offer to fight, *Cuda*, 236 S.W.3d at 90, or where there was evidence of drunken outbursts, pushing, and repeated communications despite official requests to discontinue communication, *H.R. v. Foley*, 356 S.W.3d 210, 214-15 (Mo. App.

---

[4] The petition did mention that Mother had been arrested for domestic violence. However, the domestic violence incident involved Mother's teenage daughter from a previous relationship. As the violence was not directed at Father, it is not relevant to the issues raised in this appeal, *i.e.*, whether Father had been subject to domestic violence or had been the victim of stalking. § 455.020.1. Also, the domestic violence allegation proved to be unfounded.

E.D. 2011). Repeated communication alone, on the other hand, typically does not rise to the level of harassment because, while annoying and boorish, such conduct would not cause substantial emotional distress in a reasonable person. *E.g.*, ***Nenninger v. Smith***, 400 S.W.3d 400, 405 (Mo. App. W.D. 2013); ***C.B.***, 254 S.W.3d at 213.

In the present case, Father stated he felt harassed and threatened by Mother's repeated text communications. This testimony does not rise above the uneasiness or nervousness commonly experienced in everyday life. In fact, while Father did request on one occasion for Mother to "[s]top texting me your threats[,]" he never asked her to stop communicating with him. The fact that Father made one request distinguishes this case from other cases where courts have found harassment and further supports the inference that Father did not suffer substantial emotional distress.

Even if that testimony were sufficient to show Father subjectively felt substantial emotional distress, there is no evidence to meet the second prong of the test, *i.e.*, that Mother's conduct would cause a reasonable person to suffer substantial emotional distress. It is clear from examination of the texts themselves that a reasonable person would not feel substantial emotional distress upon receiving them. The majority of Mother's communications simply provided information about the parties' children or sought to coordinate matters related to the children. Although Mother made some comments indicating she would use information against Father in court, "[l]itigation is not the type of behavior the Adult Abuse Act seeks to prevent." ***Clark v. Wuebbeling***, 217 S.W.3d 352, 355 (Mo. App. E.D. 2007).

6

Furthermore, there is no evidence that the communications in this case were without legitimate purpose. "For conduct to have 'no legitimate purpose,' it must be found to be not sanctioned by law or custom, to be unlawful, or not allowed." *Dennis v. Henley*, 314 S.W.3d 786, 789 (Mo. App. S.D. 2010). Missouri's appellate courts have repeatedly found that repeated communications regarding the care of children between estranged parents are appropriate. *E.g.*, *Clark*, 217 S.W.3d at 355. Here, the text messages were entirely related to issues involving the parties' children including their health, education, visitation issues, and the ongoing custody litigation.

The only other potentially relevant event involving the parties was the prowler incident. However, in his testimony on that issue, Father never identified the prowler. Mere speculation that Mother was involved is not sufficient to support the entry of a full order of protection. *See Suhr v. Okorn*, 83 S.W.3d 119, 123 (Mo. App. W.D. 2002).

There was no evidence to support a finding of abuse by harassment.

### *Stalking*

In support of her contention that the trial court's finding of stalking was not supported by the evidence, Mother argues Father failed to present any evidence showing he felt fear of danger of physical harm. Again, Mother is correct.

The statute defines the term "[s]talking" as occurring "when any person purposely and repeatedly engages in an unwanted course of conduct that causes alarm to another person when it is reasonable in that person's situation to have been alarmed by the conduct." § 455.010(13). The statute goes on to define the

7

term "[a]larm" as "to cause fear of danger of physical harm[.]" § 455.010(13)(a). To meet these definitions, "[a] plaintiff is required to do more than simply assert a bare answer of 'yes' when asked if he or she was alarmed." *H.R.*, 356 S.W.3d at 214 (quoting *C.B.*, 254 S.W.3d at 209). Appellate courts will reverse orders of protection based on this definition where there was no evidence of overt threats of physical harm and no evidence of physical confrontations. *E.g.*, *D.A.T. v. M.A.T.*, 413 S.W.3d 665, 668-69 (Mo. App. E.D. 2013); *C.B.*, 254 S.W.3d at 213; *Schwalm v. Schwalm*, 217 S.W.3d 335, 337 (Mo. App. E.D. 2007); *Clark*, 217 S.W.3d at 354-55.

In the present case, although Father characterized Mother's text messages as "threats," none of those messages involved a threat of physical harm. In fact, none of the messages even implied a threat of physical harm. At most, Mother threatened Father with litigation, but as stated above, "[l]itigation is not the type of behavior the Adult Abuse Act seeks to prevent." *Clark*, 217 S.W.3d at 355. There was no evidence that Mother's text messages caused alarm as that term is defined by the statute.

There was no evidence to support a finding of either abuse or stalking. Mother's point is granted.

8

## **Decision**

The trial court's judgment is reversed.  The trial court is directed to vacate the full order of protection and enter a judgment, consistent with this opinion, denying Father's petition.

MARY W. SHEFFIELD, P.J. – OPINION AUTHOR

GARY W. LYNCH, J. – CONCURS

DON E. BURRELL, J. – CONCURS

**APPENDIX**

Below is a transcription of the exhibits Father submitted at trial. The messages have been organized by date, and all photographs have been omitted. No corrections have been made to spelling or grammar.

**Undated**

Mother (7:17 AM) – The nurse checked her out. She was not to be at school. She also DOES NOT HAVE HER MEDICINE! You did not listen to instructions. You didn't look in Mikayla's mouth! She has blisters all over! She has hives all over! I have a note for her from the nurse to be sent home. Please drop her medicine off at the school. I will pick it up. You will not be getting her this weekend.
Mother (12:56 PM) – She may be ok to go back. As of now she has big white blisters. She was screaming yesterday. Pain wise she is so much better with the "magic mouthwash" it has nystatin, lidocaine and diaphenhydramine in it. She has to swish really good than swallow 10ml every 4 hrs. I'm sending the bottle. She can finally eat now bit numbs everything. Doc said it could take 7-10 days to run it's course. We are on day 4. She will be fine. She WAS miserable!

**May 27, 2014**

Mother (10:47 AM) – Your vision insurance does not list co-pays or anything it only list where the children can go I need to make sure what the co-pays are please get me that information ASAP for their appointment. I need it before 230 today
Mother (10:47 AM) – All you provided was a phone number
Mother (11:21 AM) – I have it handled. If glasses are necessary it will be $35 dollars each child for everything. Exam. Lenses. Scratch resistant. Warranty and frames at this office. So $70 total. This is if BOTH GIRLS NEED IT. THE APPTS ARE AT 4 and 5 today! I will need you to call in payment so you must be available. I was robbed and do not even have an active card! Thank you.
Mother (12:29 PM) – Expect a call between 4-6 pm. Not sure if they want payment before. I'm assuming at the end so more like 5:30ish.
Mother (3:08 PM) – We are still here. Jesse needs glasses. Kayla is in the exam. Still need to finish. May be closed to 6:30
Mother (3:09 PM) – Closer
Father (3:57 PM) – I told you I would take them. If you can't afford to pay your half you need to let me handle medical stuff.
Mother (4:34 PM) – They are holding off on Jesse. Kayla deffinately needs Prescription. They are having it all set up. You will have to come pay here they said.
Mother (4:35 PM) – They will be ready Thursday when you pick up the girls.
<photograph of bill omitted>
Mother (5:02 PM) – This includes Jesse's visit also and glasses and they gave me a $40 warranty free
Mother (5:04 PM) – Pear vision. Pick up and pay Thursday at 1518 E. Battlefield Springfield across from the battlefield mall. They close at 6pm.

Mother (5:19 PM) – Did you look at mikayla's throat?  She told me she told you that she was hurting.  She has bumps all over again.  She told me you told her to chill

Mother (5:25 PM) – It was the night after you left them sleep in a tent alone with no Adult supervision.  No adults sleeping with them outside.

Mother (7:14 PM) – Kayla just told me all the gluten food you gave her all weekend!  You are ridiculous!  Pancakes. Quesadilla.  Almond bars.  Sandwich with non gluten bread.  Cheese puffs.  WTF?????

Mother (7:14 PM) – She has a migraine asshole!!!

Mother (7:15 PM) – You are not getting her anymore!!!!

## May 28, 2014

Father (6:02 AM) – Did Mikayla go to school

Father (6:47 AM) – Where is the diagnosis you said you would get be stating she needs to be on a gluten free diet?

Father (6:49 AM) – Where is the diagnosis you said you would get me stating she needs to be on a gluten free diet?

Mother (7:15 AM) – There is not a diagnosis yet.  They are running test.  If you ever showed up to a doctor appointment you would know what's going on

Mother (7:15 AM) – Read up on gluten John educate yourself

Mother (7:16 AM) – She's at school

Mother (7:16 AM) – The school knows she's gluten-free so do you so do it

Father (3:48 PM) – Have the girls call me please

Father (4:58 PM) – Please have the girls call me.

<three photographs of gluten-free food omitted>

Mother (6:27 PM) – Corn tortillas and cheese for quesadillas.  And gluten free bread for a sandwhich or GF wrap from walmart in the deli

## May 29, 2014

Mother (9:24 AM) – Melanie is getting married on June 15.  I don't get in until June 16 at 10 PM.  She had already booked my flight I thought that you had had the girls again as usual on their birthday with your vacation when she booked it.  I've already talk to the girls and we have our birthday plan set.  Would you like to keep them and I'll pick them up from summer school on Tuesday, June 17?  If not our friends the neighbors will be happy to pick them up from summer school until I get home at 10pm and play with their friends.  Obviously you first option since it's their birthday You are their dad

Mother (9:25 AM) – I wish I could cancel the flight but she already spent the money and it's nonrefundable I am made of honor

Mother (1:30 PM) – Okay never mind I actually have something really fun planned for them

Mother (1:58 PM) – Nixa Public Schools:  Don't forget!  Tomorrow (5/30/14) is a half-day for all students.

Mother (1:58 PM) – Please send a pic with Mikayla and her new glasses

Father (2:15 PM) – I can keep them in june

Mother (6:40 PM) – Hey I just wanted to thank you for opening at case about the girls here in June.  I was preparing to do it myself that you have me that

11

jumpstart and I thank you for that. I'm really getting tired of struggling on food stamps and this low child support with no income. I also want my full custody back. I spoke with CPS today and they're really getting tired of you wanting to take the girls from me. They have no interest in doing that in fact they support me as a mother. Your calls are uneventful and unproven and they have no interest in doing anything of the sort. In fact I may have a fraud case. Alex's BS is also getting canceled and I would even have a case against her for fraud. She has a history as well as you don't you remember all those restraining orders in jail time you've done. I've already sent for records from Dr. Lieberman and all of the records from California against you.

Also all the records here in Missouri that you developed through the last six years. All the the police reports. All your fault CSP reports. All your judgments. And so on and so on. I also have all the medical records coming to me that you never paid from pregnancy birth and the three years in California where you never paid a dime. I paid it all equaling over $20,000. I'm so excited to finally get this all resolved and finally get the child support and time back with my kids thank you again. I'm also excited that my children are old enough to have a voice <smiling emoticon omitted>

Mother (6:40 PM) – By the way I have not been served I'm just not dumb

Mother (6:41 PM) –Good luck going pro se. I seem to remember winning a move away case going pro per against the Newport Beach attorney

Mother (6:42 PM) – Good thing I've been reading up on the law hope you have time

Mother (6:44 PM) – I'm also glad you present yourself as an army ranger fraud it's going to look great in court

Mother (6:45 PM) – Please have the girls call me I told them I would say good night to them

Mother (6:47 PM) – Oh by the way Mikayla's new doctor is a specialist and it is not in your insurance and there's no way around it. You're going to have to fork up the money sorry. It's for your daughter!

Mother (6:48 PM) – The only two doctors under your insurance have referred her to this guy that's it end of story. So her to doctors happen to be my doctors that's it we're in a small town you don't have a choice

Mother (6:49 PM) – The other doctor is under the insurance but this one's not. He's out of network I will find out tomorrow how much out of network the insurance covers mine only covers 35% I have to deal with it. Same goes for her.

Mother (6:49 PM) – My apt is like $43

Mother (6:49 PM) – The big appointments are like $100

Mother (6:50 PM) – That's if your insurance covers like 35%

Mother (6:50 PM) – I will see and get back to you

Mother (6:51 PM) – If you fight this it doesn't make you look good it's your daughter's health. You already look bad in front of CPS in regards to the hospital events. If you want to lose rights for custody on medical decisions I would watch it

Mother (6:51 PM) – It took a year just to get vision insurance from you and Mikayla needed glasses. It's taken a year to get Dental from you so I hope they don't have cavities!

Mother (6:51 PM) – I will bring that stuff to court

Mother (6:53 PM) – Your stupid munchehousens is bullshit. Your biggest mistake was talking to John Lewis I have genetic testing linking me to my disease you idiot!

Mother (6:54 PM) – The longer you keep saying I'm a bad mother the bigger the whole you're going to dig yourself I would stop if I were you! Or keep going ....it'll help me!!!!!!!!!

Mother (6:54 PM) – Is shouldn't talk to someone's ex are you that ignorant seriously?!?! He just wants his house back come on! He's trying to win in court also you guys are both dumb! Because both of you it's hurting each other you guys are so ridiculous!

Mother (6:56 PM) – It's actually funny

Mother (6:56 PM) – Keep it up boys

Mother (6:56 PM) – I'm going to ask the girls what time they went to bed they tell me everything so you better not be playing a game

Mother (6:57 PM) – Will have lunch tomorrow tell the girls good night since you won't let them call. At least I don't do that crap to my girls


**May 30, 2014**

Father (5:31 AM) – They were in bed by 830 I didn't get these messages till this morning I'll have them call you after school

Mother (5:51 AM) – John you never respond what's different nothing


**June 1, 2014**

Mother (8:32 AM) – Please have the girls call me

Mother (12:48 PM) – Call you right back. I'm on a conference call

Father (12:59 PM) – Call tonight they are swimming

Mother (2:43 PM) – L

Mother (2:43 PM) – L

Mother (2:43 PM) – L

Mother (2:43 PM) – K

Mother (2:43 PM) – My phone is sticking

Mother (2:43 PM) – Just have them call me as soon as you can

Mother (3:08 PM) – Do you have the kids the 29th and 30 June

Father (3:08 PM) – Yes

Mother (3:10 PM) – I was chosen for a scholarship to attend a migraine conference AHMA in LA June 29 my flight and hotel are paid for along with everything else! I can't believe they picked me. It's because of my administrative volunteer work with the hemiplegic migraine foundation. I'm so honored! I just wanted to make sure that weekend I was available.

Mother (3:16 PM) – Even Mikayla's and I new Dr. Will be there on board of doctors. He's originally with the mayo clinic. He is a good friend of the president of this association that chose me. I just found that out last night.

Mother (3:20 PM) – Prowler btw lol

Father (5:44 PM) – The girls want to sleep in. Can Nichole drop them off at your house by 10am. If not she'll drop them off at school.

Father (6:11 PM) – Fwd: May 30th to June 6th and July 11th to July 18th are my other 2 weeks of vacation with the girls. I've already notified you about keeping them June 20th to June 27th. This is all of my 3 weeks and your notification prior to May 15th per the custody agreement.

Mother (6:12 PM) – They are committed to summer school. It's only 4 wks

## June 2, 2014

Mother (9:55 AM) – Why aren't the kids at summer school? This is their first day! I'm here for lunch and my kids are not here!!

Mother (10:01 AM) – The school is not happy and either am I

Mother (10:06 AM) – I made sour you got this last night "They are committed to summer school. Its only 4 wks" summer school is serious They are committed to summer school. Its only 4 wks"

Father (3:07 PM) – They got great grades. Jesse brought up her D....so I'd rather reward them with a good Summer start. If you want to take them next week on your days that's fine.

Mother (3:23 PM) – They are scheduled, enrolled and assigned teachers and are expected to be in summer school. The school hired teachers by number of students enrolled. They've already missed one day which costs the school. They are expected to be there tomorrow. Make sure they are there on time. This is not up to you this is been handled through the school and done in advance with the teachers and the principal. The school will be notifying me once they get there.

Mother (3:24 PM) – I will have the truant officer get involved if they're not there

Mother (3:24 PM) – Jesse had reading and math tutors all year this is not up to you.

Mother (3:25 PM) – She is still behind in her grade level and she needs summer school to be up to par for next year. I'm involved with the school not you

Mother (3:26 PM) – She is not even at the bottom of the standard for fourth grade level for entry for next year

Mother (3:26 PM) – She needs to be retested after summer school

## June 3, 2014

Mother (3:25 PM) – Once again no school I'm getting a letter from the principal

Father (3:36 PM) – It's our vacation. Stop texting me your threats. Do what ever you need to. I do not need these senseless and threatening text messages daily.

Mother (3:37 PM) – There are threats this are information from the school principal I'm making you aware. You really should get a dictionary or a thesaurus. Seems you don't understand vocabulary

Mother (3:38 PM) – And you don't care about the needs of your children

Mother (3:40 PM) – Me being custodial parent have just passed on the information you've provided me via text about your priorities for the kids to the school since I signed contracts in their best interest based on what the school has provided me on based on Jesse's best interest. I meant Support and Jesse not struggling through fourth-grade life is not a big party. I want my children to be successful!

Mother (3:42 PM) – We don't believe in the same things so will just see what a court thinks.  I'm just getting the paperwork that they gave me!  I'm doing my part as a mother to benefit my child!
Mother (3:42 PM) – You are disregarding it as usual

### June 4, 2014
Mother (9:11 AM) – Mrs. Wilkerson had called me and said you told her the kids are on vacation with you.  I'm having her put this in writing and getting Jesse's reading scores and tutoring info supplied to me for court to show once against your lack of patenting skills.
Mother (9:13 AM) – Jesse's reading is at 3 rd grade level.  Summer school was to help get it up to beginning of 4th grade.  You are hurting your child once again.

### June 5, 2014
Mother (10:01 AM) – Please have the girls call me